## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Petitioner

    v.

JOSEPH PAYNE-PABON,

    Defendant.

Criminal No. 22-229 (ADC)

### OPINION AND ORDER

Pending before the Court is defendant Joseph Payne-Pabón's ("defendant") motion to suppress statements at **ECF No. 79.** For the following reasons, defendant's motion at **ECF No. 79** is **DENIED**.

I. **Procedural background**

A. The indictment, motion practice, and trial schedule

On May 25, 2022, a grand jury returned a one-count indictment charging defendant with a carjacking resulting in death in violation of 18 U.S.C. § 2119(3). **ECF. No. 1**. All of defendant's statements were disclosed by the government in 2022. Several follow up conferences were held. Defendant, represented by the Office of the Federal Public Defender ("FPD"), informed that no dispositive motions were anticipated. **ECF No. 35**. Accordingly, on January 17, 2023, the Court scheduled trial to commence on July 10, 2023. **ECF No. 35**.

After securing an extension of time, the government logged its designation of evidence on February 27, 2023. **ECF No. 38**. Among other matters, on April 27, 2023, the government filed a motion to preclude defendant from eliciting the self-serving portions of his interview with law enforcement agents. **ECF No. 43**. On June 12, 2023, the Court granted the government's motion as unopposed. **ECF No. 49**.

On August 1, 2023, the defense moved to continue trial because new counsel within the FPD's office had been assigned who needed "…to review the complete case file and if necessary, conduct meetings with the government in relation to the evidence and/or negotiations… meet with [defendant] to once again review all the evidence disclosed by the government and prepare for trial." **ECF No. 51**. The Court granted the continuance as requested by the defendant and rescheduled trial for February 12, 2024. **ECF No. 52**. In view of the designation of evidence on file, on October 2, 2023, the Court specifically ordered that "[a]ny In Limine Motions… shall be filed not later th[a]n 12/15/2023 and responses thereto by December 29, 2023. No extension to be granted." **ECF No. 53**.

Eight months later, defendant filed a motion requesting leave to file an *ex post facto* opposition to the government's motion in limine to preclude defendant from eliciting self-serving statements. **ECF No. 58**. On January 10, 2024, the Court held a pre-trial conference. **ECF No. 69**. The Court discussed pending motions and other pending issues including the

defense's "Psychodiagnostic Assessment Report" dated October 20, 2022.[1] **ECF No. 70**. At no moment, however, did the defense indicate its intention to suppress defendant's statements on constitutional grounds, based on the findings included in the psychodiagnostic report or otherwise. *Id*.

Following the defense's second motion to continue trial, and after a lengthy discussion thereof during the pre-trial conference, trial was again pushed back to August 5, 2024. **ECF No. 70**. The Court specifically noted that the rescheduling of the trial dates was meant to "allow the defendant additional time to meet with his counsel for trial preparation." *Id*. Moreover, during the January 10, 2024 pre-trial conference, the Court granted defendant's pending requests for extensions of time. *See* **ECF No. 71**. The defense did not raise any issues or requested an extension of time to move for suppression of defendant's statements to law enforcement agents.

Six months later, on June 12, 2024, out of left field the defense moved to suppress his statements to law enforcement. **ECF No. 79**. Notably, defendant's motion did not include an affidavit or other evidence aside from counsel's allegations in support. *See* Local Rule 147(a); *see United States v. Calderón*, 77 F.3d 6 (1996); *United States v. D'Andrea*, 648 F.3d 1, 5 (1st Cir. 2011).[2] Via reply (also untimely) to the government's response, **ECF No. 82**, defendant simply

---

[1] The Psychodiagnostic Assessment Report thus, had been available to defense counsel since early stages of the case and prior to counsel's substitution in August, 2023.

[2] On this ground alone, the motion ought to be denied.

stated that his request for suppression was "timely" inasmuch as no deadlines for motion practice had been set.[3] **ECF No. 87**.[4] Ten days before trial was set to commence, the defense filed yet another motion to suppress. **ECF No. 97**. This time around, the defense moved to suppress an "eyewitness identification testimony" and to preclude any subsequent in-Court identification. *Id*.[5]

Even though the Court was under no obligation to do so, the Court granted defendant an evidentiary hearing on both motions to suppress. **ECF No. 84**. The hearing was held on August 8 and 12 of 2024. During the hearing the Court allowed the parties more than enough time and opportunity to present their case for and against suppression. The government presented two witnesses from the Puerto Rico Police Bureau ("PRPB"), Sergeant Arnaldo Ruiz-Medina ("Agent Ruiz") and Miguel Sáez-Rosario ("Agent Sáez"). The defense only called

---

[3] The record reflects that defendant's argument has no basis. On January 17, 2023, defense counsel reported no dispositive motions were to be filed and trial was set. **ECF No. 35**. Upon the filing of the designation of evidence, the Court enabled the filing of *in limine* motions ("related thereto") by no later than December 15, 2023. **ECF No. 53**. Clearly, the deadline for dispositive motions had elapsed and counsel for the FPD never asked for an extension of such term.

[4] Notably, the defense had not yet given any response to the government in connection with the latter's request for reciprocal discovery and for notice of affirmative defenses filed on February 2023. *See* **ECF No. 83**.

[5] The Court denied defendant's motion to suppress the identification eyewitness testimony from the bench. *See* **ECF No. 120** at 12-16, 155-156. The defense did not ask the Court to admit defendant's mug shot or related newspaper articles. The defense did not make an offer of proof as to those items. *See* Fed. R. Evid. 103(a)(2). Four days later, on August 12, 2024, the defense filed a motion for reconsideration. **ECF Nos. 122; 122-1**. The defense did not submit with its motion for reconsideration any mugshot photographs or newspaper articles. The defense was also allowed time to argue their motion for reconsideration. During oral argument, the defense asked the Court to admit certain mugshot photographs and newspaper articles for the first time. The Court denied the defense's request under several grounds including relevance, waiver, procedural default and failing to preserve a claim of error. Accordingly, defendant's motion to suppress identification testimony of an eyewitness is not addressed in this Opinion and Order.

Dr. Alexandra M. Ramos-Duchateau (for purposes of this Opinion and Order, the "expert") as an expert witness to testify about her findings in the Psychodiagnostics Assessment Report dated October 20, 2022 and the Reasonable Accommodation Report dated October 20, 2020.[6] *See* Evidentiary Hearing Exhibit C.

### B. The interview, the statements, and the motion to suppress

Defendant is accused of carjacking an 82-year-old retired teacher's white Hyundai Sonata motor vehicle on January 7, 2020. The victim was hit in the head with a cement block and was found dead in the backyard of her home. On January 9, 2020, PRPB officers saw defendant driving the victim's car. The officers ordered the driver to stop. Defendant sped away, crashed the car and took off running, leaving behind two "friends" inside the stolen vehicle. The PRPB arrested his two friends, identified as Ana Del Pilar and Erick De Jesús. A day later, defendant purportedly informed the Puerto Rico Police Bureau (PRPB) agents that he wanted to surrender and talk.[7]

Throughout the testimony in Court, the following facts were ascertained. Defendant was arrested on January 10, 2020 and interrogated by Agent Sáez. Agent Ruiz and Officer

---

[6] The purpose of the expert's evaluation was to request for "reasonable accommodation" in the form of a modified trial schedule providing for only three hours of trial per day. In so doing, defense counsel alluded to defendant's limited ability to concentrate. Later, as reflected by the record, institutional records reflected that defendant's attention span had considerably improved while being under medical treatment. For the reasons stated on record (defendant being under medical treatment, his demeanor and ability to communicate with counsel as observed by the Court throughout evidentiary hearings held, trial length, procedural and operational disrupte and undue burden to jurors, among others), the request for shorter trial days was denied.

[7] This paragraph describing the underlying factual scenario of the case is included for purposes of background and does not constitute findings for any other purposes or proceedings.

Elvin Castillo ("Agent Castillo") were also present during the interrogation, albeit intermittently. However, Agent Ruiz remained present during the time when defendant was advised of his Miranda rights and while defendant initialed, marked, and signed the PRPB *Miranda* form. Agent Sáez advised defendant of his *Miranda* rights verbally because defendant indicated he did not read or write "well." To wit, Agent Sáez went over and sequentially read out loud each warning as incorporated in a pre-printed PRPB *Miranda* form. Agent Sáez asked defendant if he understood each of his rights as he read them one by one. Defendant answered and corroborated that he understood by providing an affirmative response each time and by indicating that he understood and remembered that in a prior occasion he had been so warned. Accordingly, Agent Sáez asked defendant to put his initials next to each right listed in the printed form. Defendant placed his initials next to the first five enunciations of *Miranda* rights. After each right was read to him, and the PRPB agent verified that defendant understood each of these rights, Agent Sáez asked defendant if he was willing to waive his rights and speak to him. Pursuant to the testimony of two eyewitnesses (Agent Ruiz and Agent Sáez), defendant verbally agreed to speak to the agents.[8] Accordingly, Agent Sáez once again pointed to the pre-printed *Miranda* Form, specifically to the middle portion of the *Miranda* Form, and the boxes that include a waiver statement where defendant had to place his

---

[8] Defendant did not write his initials next to the sixth and last row in the upper part of the pre-printed Waiver Form. This sixth section read: "Knowing and understanding your rights as I have explained them to you, are you willing to answer questions without an attorney present?" **ECF No. 130-3** at 1.

markings and the blank space at the bottom of the form for defendant's signature. Agent Sáez instructed defendant to mark the box in which, consistent with his statements, he agreed to the interview and talk to the agents. Defendant made three marks on the boxes of the pre-printed form and signed it in the space provided.[9] The first marking reflected he had "not exercised" his right to read the form by himself. By the second marking he acknowledged his rights and waving them voluntarily." The third marking was to reflect "he understood this admonishment" and "did not waive his rights." Agent Sáez did not review the waiver form after it was signed. However, based on defendant's reiterated waiver, the agent proceeded to interview defendant. Based on the agents' testimony as well, at no time did defendant hesitate, asked for counsel or gave indicia that he wanted to conclude the interview.

During the interview, defendant made several statements and hand drawings related to the charged conduct and crime scene. **ECF No. 113-1**. Reportedly, in order to make himself understood, it was defendant who offered to make the drawing of the crime scene at the victim's house or premises. **ECF No. 120** at 89. The interviewer took notes of each question posed to defendant and answers provided. The notes of the interview were read back to defendant who proceeded to sign and adopt the written report of the interview. Evidentiary Hearing Exhibit 4 at 4. The notes reflect the following:

    1. Did the police officers that arrested you mistreat you? No (shaking his
    head)
    2. Are you unwell? No

---

[9] Evidentiary Hearing Exhibit 2C.

3. Have you used drugs? Crack yesterday, when the police intervened

4. How far did you go in school? I studied at a Vocational school for disabled children

5. Do you know how to read and write? I don't know how to read well, I learned how to write my name (starts crying)

6. Has anyone forced you to talk? No

7. Why do you want to talk? Because I am not an abuser, and we are both going to comply.[10]

8. Who 2? The brother and I

9. Who's the brother? The other one who was arrested with my sister

10. What's your sister's name? I call her Naipi

11. What happened on January 7, 2020? We arrived at a residential area, I was looking for copper and my brother was saying that he was going to make money. We were walking around the neighborhood.

12. What clothes were you wearing? A white shirt with a big Jordan [logo] on the chest, pants, white socks, black sandals and a white bandana on the forehead. My brother had a gray jacket, black pants, tennis shoes and sunglasses.

13. What happened in the neighborhood? We arrived at a corner house, my brother told me: "wait for me here, I will be right back", and he went into a house. I thought he was going to steal copper.

14. What did you do? I stayed hidden near the other street because there was a gray car with a man in it.

15. How long did you[r] brother take inside the residence? I don't know how long, but he took a while because I got worried.

16. What happened then? (He made a drawing so that I could understand) My brother comes out in a white car, and he tells me "Get in, now". He jumps to the backseat, and I start driving out of there. I ask my brother what had happened, and he tells me: "forget about it". My brother was looking inside the bag while I was driving. I do not remember where I stopped, my brother wanted to throw away the bag, but the rear window was not opening because it had a lock and he tried to throw it away through the front window because it was slightly open. It did not fit through the window, and I helped him pushing the bag. We left again.

17. What color is the bag? Black

---

[10] The original Spanish language word is "servir," which means to "serve." Read in context, in this Court's opinion, the correct interpretation and inference should be "we are both going to serve time." The parties agreed with this interpretation and agreed as well to such clarification or correction of the translation.

18. Go on. My brother gave me some blue gloves and he also put on the gloves that were in the car. I think that a girl saw me, but I do not remember. I think she followed us. Then he dropped me off in Luquillo at a homeless shelter and my brother left. I am not sure if it was the next day, we went to remove a license plate, my brother got out to take it and I stayed in the car, driving. Some people took a picture of us, and my brother flipped the bird at them. A lady approached us, and I flipped the bird at her, and we left.

19. What did you do then? We were at Manuela Pérez the next day, and it happened that they chased me until we crashed, I took off running and hid inside a garbage can. I wanted to turn myself in today because they caught my sister. They arrested me and that's when I found out that they had killed a lady.

20. Anything else you want to say? I have nothing to do with killing a lady, the one who went inside was my brother.

**ECF No. 113-1** at 2-5.

Defendant moves "to suppress [the] statements" made to the PRPB officers on the day of his arrest on January 10, 2020.[11] The defense argues that defendant "invoked his Fifth Amendment rights on the PRPB Miranda Form." **ECF No. 79** at 3. Specifically, he contends that law enforcement agents violated his right to counsel by interrogating him "after he had already invoked those rights" in the PRPB *Miranda* Form. *Id*. Similarly, he posits that the at-issue statements were taken by PRPB agents in violation of his right to remain silent because "he indicated on the PRPB form that he declined to waive his Fifth Amendment rights." *Id*., at 9. The defense argues that a contradictory response in the waiver of rights form equates an invocation of his right to remain silent and for the assistance of counsel. Alternatively,

---

[11] The government informed that it would not present evidence or testimony related to the defendant's second post-arrest interview that took place in 2022. **ECF No. 82** at 5.

defendant argues that he did not "knowing and voluntarily waive his Fifth Amendment rights[]" based on his "intellectual functioning problems" as described in the psychodiagnostics evaluation report. *Id.*, at 11-12. Specifically, he argues that he did not "understand" the *Miranda* rights or the "significance of his waiver." *Id.*, at 13-18. On top of that, defendant claims that the "coercive environment in which the PRPB officers interrogated [defendant] renders his statements involuntary." *Id.*, at 18-21.

## II.    Legal standard

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection includes the right to be warned about the right to remain silent and to have the assistance of counsel at a custodial interrogation. *Miranda v. Arizona*, 394 U.S. 436 (1966) ("*Miranda*"). Waiver of *Miranda* rights prompts an "inquiry into whether a *Miranda* waiver was voluntarily, knowingly and intelligently made." *United States v. Donald*, 84 F. 4th 59, 66 (1st Cir. 2023) (quoting *Miranda*, 384 U.S. at 444).

Such waiver has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, it must be voluntary, "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*, at 421. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. These questions must be answered after

examining the totality of the circumstances. *Id*. The government bears the burden of preponderance. *See United States v. Carpentino*, 948 F.3d 10, 26 (1st Cir. 2020).

## III.    Discussion[12]

### A.    Defendant failed to invoke his Fifth Amendment rights on the PRPB *Miranda* form during interrogation

Most of defendant's southpaw attacks have footing on the events that transpired on January 10, 2020 when he was interrogated by PRPB officers. To wit, the crux of his Fifth Amendment arguments originates from the inconsistent markings on the second segment of the Waiver Form when defendant allegedly "invoked"[13] his rights to counsel and also to remain silent by placing his initials, signature, and markings on PRPB's *Miranda* form. *See* **ECF No. 79** at 3-10. The portion of the *Miranda* form in controversy reads as follows:

> Instructions: complete the information requested below and select one of the options provided below by writing an X on the square (□) in the presence of a witness and the Police officer.
>
> I _____ (full name in print) of ___ years of age here by certify that on today's date the aforementioned warnings were read and explained to me, and that
>
> I □ **exercised** / ☒ I **did not exercise** (please mark the choice with an X) the right to read them by myself.

---

[12] For purposes of clarity, the layout of the discussion in this Opinion and Order will in essence, track that of the defendant's motion to suppress at **ECF No. 79**.

[13] Because it does not affect the outcome of this Opinion and Order, the Court will assume (without deciding) that checking the "do not wish to waive" box in the PRPB *Miranda* Form in some cases could amount to an invocation of the Fifth Amendment rights. *See United States v. Ortiz-Ortiz*, Crim. No. 21-192 (RAM), 2024 WL 621305, at *5 (D.P.R., Feb. 14, 2024). Thus, the Court need not address several pages of defendant's filings arguing that point. *See* **ECF No. 79** at 5-7.

☒ I understand the rights granted to me by such warnings and I **waive them voluntarily** fully aware that I can stop being questioned and/or invoke my right to be assisted by an attorney at any time. The waiver of these rights has been voluntary, without coercion, intimidation, violence, pressure, or any promises.

☒ I understand the rights that these warnings confer me, and I have decided to **NOT waive** theme.

**ECF No. 113-1** at 1. Defendant also submits that even when he might have made markings creating an inconsistency as to his intention to waive, the marking on the box that indicates he did not wish to waive his rights prevails over his marking indicating the exact opposite (*i.e.*, that he waived his rights). In defendant's view, his contradictory markings "[are] of no moment." **ECF No. 79** at 8. Based on this limited view of the totality of the circumstances, defendant claims that the statements he gave to the PRPB officers must be suppressed because they violate his right to counsel and to remain silent. Accordingly, and following defendant's motion to suppress' layout, the Court will discuss each argument in turn.

### 1.    Right to counsel

Defendant contends that his invocation of his right to counsel by placing a checkmark on the PRPB *Miranda* Form took place at the very beginning of his interview. As such, it follows that his statements are wholly excludable because all questioning must have invariably stopped. **ECF No. 79** at 4. But, even if that marking (standing alone) could be construed as an invocation of a right to be assisted by counsel, it is not the case here. Indeed, as timidly admitted by the defendant, he had also previously waived all constitutional rights

listed within the First Section of the Waiver Form. More so, defendant did not just check the "Not to waive" box, but prior to it, he had also checked the box that states that he understands his rights and "voluntarily waives them." Both statements appear immediately one after the other in the same Form and defendant marked them contemporaneously. **ECF No. 79** at 5; **113-1** at 1. The conflict between these markings is not insignificant.

It is beyond dispute that a request for counsel "must be clear and unambiguous." *United States v. Oquendo-Rivas*, 750 F.3d at 18–19 (citing *Davis v. United States,* 512 U.S. 452 (1994)). In other words, the request "must be such that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*., at 19. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal… our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459.[14] A request "that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel" does not meet the bar. *Id*. (emphasis in the original).

---

[14] Although defendant did not properly raise the issue, for sake of completeness the Court notes that there is no authority supporting a finding that failing to place initials in a section drafted or intended to ratify defendant's prior waiver of his right to counsel (line 5) constitutes a clear and unambiguous invocation of the right to counsel. To the contrary, caselaw suggests it does not. *See Davis*, 512 U.S. at 461 (holding that a defendant must "affirmatively invoke[ ]" his right to counsel); *United States v. Sweeney*, 887 F.3d 529, 536 (1st Cir. 2018), cert. denied, ––– U.S. ––––, 139 S. Ct. 322, 202 L.Ed.2d 226 (2018) (quoting *Davis* 459) ("Invocation of the *Miranda* right to counsel requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."). Actually, the premise in the 6th line was to be answered with a "yes" or "no" rather than initials intended to ratify a waiver.

**(i)    The *Miranda* form and defendant's markings**

Defendant did not develop an argument to convince the Court that two mutually exclusive markings contemporaneously made by the defendant in the same *Miranda* Form constitute a "clear and unambiguous" request for counsel in this particular case. Defendant cites several cases but on each, the factual scenario are easily distinguishable from the case at bar. For example: *United States v. Johnson*, 400 F.3d 187 (4th Cir. 2005) (where defendant clearly answered "no" when asked if he wanted to make a statement without counsel being present.); *United States v. Donald*, 84 F.4th 59 (1st Cir. 2023)(where defendant did not check the line next to the statement indicating he wanted to talk and waive his rights). Contrary to what happened in *Donald*, defendant here made markings reflecting waiver of rights, twice. Defendant also cites to *United States v. Fernández-Soto*, 2024 WL 510283 (D.P.R., 2024) but the facts in *Fernández-Soto* do not support his contentions. In *Fernández-Soto* the inconsistencies or contradiction were between two different waiver form, one from local police indicating defendant did not waive, and the second to federal agents who should have been reasonably on notice that defendant had asserted his constitutional rights.

The text of the PRPB *Miranda* Form at issue in this case is not per se ambiguous (contains no ambiguous language). Any ambiguity, if any, as to the Waiver Form in this case was inserted by defendant when he placed his inconsistent markings. Although the defense went through great lengths to avoid conceding that defendant markings were ambiguous,

during cross-examination, counsel for the defendant noted: "obviously this document has conflictive statements[,]" referring to defendant's markings on the form. **ECF No. 120** at 116.[15]

The defense places great significance on defendant's markings indicating he was not waving his rights. Nonetheless, any such significance can not be equated with defendant's conscientious choice without examining the totality of circumstances. For example, all parties agree that defendant has difficulty or outright cannot read and write, as such; the fact that he placed checkmarks on conflictive statements cannot be readily and independently interpreted as an unequivocal choice to have counsel assistance as the defense superficially proposes. To wit, according to Agent Sáez testimony:

> Q. So did he read them or didn't he read them?
> A. He didn't read them.
> Q. Why not?
> A. Because he didn't know how.
> Q. Please explain to the Court the process or how you went about reading the Miranda warnings to Mr. Payne.
>
> A. Well, in the beginning I explained to him the reasons for which he was there which was for the murder of Ms. Eulalia. And I asked him if he knew about the Miranda rights and he said yes because he had been in jail before, so they had been read to him before. Well, after I explained that to him and then I gave him the document to read and saw that he had problems reading, that he couldn't read them, then I read them to him.
> Q. How did you read them?

---

[15] Notably, aside from a lonesome sentence stating that "any ambiguity in the PRPB form should be resolved against the government," defendant does not properly challenge the PRPB *Miranda* form per se, as "ambiguous." **ECF No. 79** at 8; *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (undeveloped issues are waived). Thus, there is no room to argue that doubts as to defendant's request for counsel must automatically favor the defendant. *See generally United States v. Ortiz-Ortiz*, Crim. No. 21-192 (RAM), 2024 WL 621305, at *6 (D.P.R. Feb. 14, 2024)(collecting cases).

A. (Partial answer uttered in Spanish).

Q. No, how did you read them?

A. Well, I started to read to him saying that he had a right to remain silent and I asked him if he understood and he said yes. And that's how I did with each one of them. I would read it to him. I would ask if he understood and he would say yes.

Q. And how would you describe the rhythm or the speed at which you were reading them?

A. I was explaining it to him slowly so that he could understand.

Q. Did he give you any indication that he was not understanding what you were telling him?

A. At no time.

**ECF No. 120** at 80.

Neither did defendant cite caselaw that would support a finding of a clear and unambiguous invocation of right to counsel in cases where a single form contains "conflictive" markings contemporaneously made.[16] Defendant seeks support on sister district courts' opinions in cases that are easily distinguishable and are also unavailing because those cases dealt with markings not in one but rather on multiple *Miranda* Forms signed by the defendant at different times or that contained conflicting or ambiguous language. *See United States v. Ortiz-Ortiz*, Crim. No. 21-192 (RAM), 2024 WL 621305, at *5 (D.P.R., Feb. 14, 2024) (more than one *Miranda* form was handed to the defendant and the second officer should have reasonably known of defendant's refusal to waive his rights); *United States v. Fernández*, Crim. No. 23-063 (FAB), 2024 WL 510283, at *8 (D.P.R. Feb. 8, 2024) (noting that law enforcement agent

---

[16] Defendant's reliance on *United States v. Donald*, 84 F. 4th 59 (1st Cir. 2023) is misplaced since the parties in *Donald* agreed that defendant's actions of not signing or checking the waiver box constituted a proper invocation of Fifth Amendment rights. *See id.*, at 66.

"provided the defendant multiple waiver forms..." but stating that the second waiver was not voluntary because agents should have reasonably known that the defendant had initially exercised his constitutional rights); *United States v. Cintrón-Ortiz*, No. CR 21-316 (ADC), 2023 WL 3719630, at *2 (D.P.R. May 30, 2023)(same; moreover, defendant cites from a Report and Recommendation that has not been adopted by the Court and, thus, is no authority); *United States v. Soler-Muniz*, 19-247 (PAD), ECF No. 59 (same). The difference between these cases and the one at bar is not insignificant. In those other cases, the courts found that at least one of the multiple pre-printed *Miranda* forms executed by the defendant contained an unequivocal invocation of right to counsel. The same cannot be said in this case.

The only factually similar case (yet, not exactly on point) the Court was able to find is *United States v. Brown*, 287 F.3d 965 (10th Cir. 2002), where the *Miranda* form executed by defendant indicated that the defendant "answered 'yes' when asked if he would answer questions without a lawyer present, but also answered 'yes' when asked if he wanted a lawyer and if he wanted to talk to a lawyer." *Id*., at 972. The Court of Appeals for the Tenth Circuit held that defendant's "ambiguous responses did not invoke his right to counsel upon his arrest and incarceration." *Id*., at 973. Here, too, defendant's conflictive markings, without more, cannot be "unambiguous."

Under the totality of circumstances, the Court should also note that Agent Sáez failed to notice the incongruent markings. Agent Sáez testified that upon reading the relevant sections within the Waiver Form to defendant and obtaining verbal responses, he gave defendant the

Waiver Form to be filled and signed. Indeed, Agent Sáez testified he did not review the *Miranda* form after it was signed because "at all times" defendant said he wanted to talk to the PRPB. Relying on defendant's verbal consent and conduct, Agent Sáez put away the *Miranda* form at issue and began with the interview.[17] Therefore, Agent Sáez could not have reasonably understood or interpret defendant's marking as a clear indication of a decision to invoke his Fifth Amendment rights. *United States v. Carpentino*, 948 F.3d 10, 24 (1st Cir. 2020) ("whether the suspect has articulated his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (quoting *Obershaw v. Lanman*, 453 F.3d 56, 64 (1st Cir. 2006)).

As previously outlined, under the totality of circumstances analysis, the fact that defendant does not know how to read, that he asked for his rights and the Form to be read to him and did not read or know what was stated in that sixth line does not support a claim of an intended or clear assertion of a right. Instead, it arguably provides an explanation to a contradictory marking resulting from, perhaps, pure confusion. The truth remains that upon placing all markings defendant proceeded to sign the waiver form after having uttered his intent to talk and surrender "because he was not an abuser."

---

[17] As to this particular issue, Agent Sáez answered the government's questions on direct examination: "Q. At that time before starting the interview, did you pause to check the marks that he had made? A. No, at no time. Q. Why not? A. Well, since at all times he wanted to talk to me then I just trusted it." **ECF No. 120** at 85.

Therefore, after examining the totality of circumstances, which remain unchallenged by the defense, the Court can only find that his invocation of right to counsel was not clear and unambiguous.

**(ii)    Defendant's conduct and verbal waiver**

Aside from the fact that the Form does not contain an unambiguous invocation, the government presented evidence that proves beyond preponderance that the events surrounding the execution of the *Miranda* Form also constitute a constitutionally sound waiver of rights.

The uncontroverted testimony of the two PRPB officers proves well beyond preponderance that the defendant knowingly, intelligently, and voluntarily waived his constitutional rights orally while being advised of such rights and while he was filling out the different portions of the PRPB *Miranda* form on January 10, 2020. Specifically, Agent Ruiz was asked:

> Q. And how did the defendant react to being read each of the warnings?
> A. He was cooperative, and he said that he understood them.
> Q. And what happened after Agent Zayas[18] finished reading the warnings?
> A. He asked Joseph to either mark or put his initials on each one of the warnings of the rights that had been read to him.
> Q. And how did Mr. Payne-Pabón react to that?
> A. He accepted. And, as I mentioned to you before, he was cooperative, so his handcuffs were moved a bit to the front, and Mr. Joseph started marking each one of them. And he also stated that he was going to continue talking to the police.

---

[18] It should be "Sáez." The transcript will be corrected in due course.

Case 3:22-cr-00229-ADC    Document 218    Filed 05/19/25    Page 20 of 37

**Criminal No. 22-229 (ADC)**                                        **Page 20**

Q. Okay. And after he initialed the warnings, what happened next?
A. Mr. Joseph Payne marked each one of the warnings also the part that said that he waived his rights, he signed these and then Officer [Sáez] also signed said document.

**ECF No. 120** at 29-30. Similarly, among other relevant portions of his testimony, Agent Sáez

testified at the evidentiary hearing:

Q. What did you do after he finished signing the document and you signed it?
A. I started to interview him.
Q. Why did you decide to start to interview him?
A. Because he wanted to talk to me.
Q. At that time before starting the interview, did you pause to check the marks that he had made?
A. No, at no time.
Q. Why not?
A. Well, since at all times he wanted to talk to me then I just trusted it…
Q. When you were reading him the warnings and he was signing that document, what was he verbalizing? What was he saying with his mouth?
A. That he wanted to talk to me at all times.
Q. Did you ever -- did there come a time when you noticed that the markings that he made were not the ones that you had explained to him?
A. I'm sorry?
Q. Did you ever learn that the document had additional markings to the one that you previously had mentioned?
A. No. No, I didn't find out.
Q. At any point during the interview, did you notice that he had made an additional marking?
A. No.
**Q. And what was your reaction upon learning that he had also marked that he did not waive his rights?**
**A. That it's a mistake, it's wrong.[19]**
Q. Why do you think it's a mistake?

---

[19] Moreover, as cited and discussed before, Agent Sáez also testified that defendant did not know how to read.

A. Because at all times he wanted to talk to me. And he had said it, that he
wanted to talk to me.

*Id.*, at 85-86 (emphasis added); *see also id.*, at 93, 111-12, 116, 125. Moreover, the evidence shows

that midway through the interrogation, defendant reiterated his waiver, consent, and

willingness to answer the questions. Namely, after answering several other questions,

defendant was asked "why do you want to talk." **ECF No. 120** at 152. "Because I am not an

abuser and we are both going to [serve time]," he answered. *Id.*[20]

Defendant's verbal waiver and conduct through the interrogation suffices to deny

defendant's motion to suppress. Indeed, "[o]ral waivers of *Miranda* rights are sufficient."

*United States v. Guzmán*, 603 F.3d 99, 106 (1st Cir. 2010); *see North Carolina v. Butler*, 441 U.S.

369, 373 (1979)("in at least some cases waiver can be clearly inferred from the actions and

words of the person interrogated."); *Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010)("If

[defendant] wanted to remain silent, he could have said nothing in response to Helgert's

questions, or he could have unambiguously invoked his *Miranda* rights and ended the

interrogation.").

Defendant's explanation as to why he waived his right by choosing to speak with the

PRPB about the carjacking and resulting homicide (because he was not an "abuser" and

because they arrested his friend Ana Del Pilar) is very telling in this case as a clear indication

of defendant's intentions. *See United States v. García*, 983 F.2d 1160, 1169 (1st Cir. 1993) (all that

---

[20] At the hearing, defendant did not put forward any evidence or testimony to contest the credible testimony of
both PRPD officers.

is "required is a clear showing of the intention, intelligently exercised, to relinquish a known and understood right[.]") *(citing Patterson v. Illinois*, 487 U.S. 285, 292 (1988)).

In light of the totality of the circumstances, the Court finds that the government has met its burden of demonstrating that defendant did not invoke his right to be assisted by counsel under the Fifth Amendment and that, instead, he knowingly waived his Fifth Amendment rights. Thus, defendant's motion to suppress grounded on a violation of such right is **DENIED**. The evidence and the credible testimony heard during the evidentiary hearing shows that defendant did not "unequivocally demand[] assistance, request[] the lawyer's presence, or otherwise clearly indicate[] an unwillingness to make a statement absent presence of an attorney." *Carpentino*, 948 F.3d at 24 (quoting *United States v. Oquendo-Rivas*, 750 F.3d at 19. The evidence and testimony further showed that defendant voluntarily waived such right. *See Guzmán*, 603 F.3d at 106; *Berghuis v. Thompkins*, 560 U.S. at 386.

## 2.      Right to remain silent

Defendant's argument for suppression of his statements due to the alleged violation of his right to remain silent also hinges on the premise that he placed a checkmark on the PRPB *Miranda* Form asserting that he did not wish to waive his right to remain silent. **ECF No. 79** at 9. Moreover, he argues that his statements are excludable under Fifth Amendment because his interrogation did not meet the *Michigan v. Mosley*, 423 U.S. 96 (1975) four-factor test applicable

to cases where the suspect changes his mind as to talking to law enforcement after an initial invocation of the Fifth Amendment.[21] **ECF No. 78** at 9-11.

Defendant jumped the bell. Although the Supreme Court did not come up with a specific invocation language it did hold that **"**[t]here is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously." *Berghuis*, 560 U.S. at 381; *see United States v. Grubert*, 605 F. Supp. 3d 171, 177, 2022 WL 1568407 (D. Mass. 2022)(reasoning that the evidence presented did not "evince[] [that] a person unambiguously asserting his right to remain silent."); *United States v. Lara Lara*, 440 F. Supp. 3d 64, 69, 2020 WL 746609 (D. Mass. 2020) (explaining that "the Supreme Court has not specified the language necessary to invoke the right to remain silent. However, the Court has explained that an accused who wants to invoke his or her right to remain silent must do so unambiguously."). Asking for unequivocal or unambiguous invocation of the right to remain silent is not unreasonable. "[A]n unambiguous invocation of *Miranda* rights results in an objective inquiry that avoid[s] difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity." *Berghuis*, at 381 (cleaned up).

As discussed before, the invocation of Fifth Amendment rights in this case is all but unambiguous. Regardless of the "conflictive" markings placed by defendant in the PRPB

---

[21] To wit, "(1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of *Miranda* warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect." *United States v. Lugo Guerrero*, 524 F.3d 5, 12 (1st Cir. 2008).

*Miranda* Form, the government showed by a preponderance of the evidence that defendant verbally waived his rights before and during his interrogation, which suffices to deem his rights waived even if the invocation prior to the interrogation had been sufficient. *See Guzmán*, 603 F.3d at 106 (accepting verbal waiver of *Miranda* rights). Moreover, the undisputed testimony and evidence show that defendant's actions and words during the interrogation also constituted waiver. *Butler*, 441 U.S. at 373 ("waiver can be clearly inferred from the actions and words of the person interrogated."). Here, according to Agent Sáez, "[a]t all times he said that, yes, that he wanted to talk to me because what they had done to Ms. Eulalia was an abuse." **ECF No. 120** at 83. Moreover, Agent Ruiz testified that defendant "was cooperative so his handcuffs were moved a bit to the front, and Mr. Joseph started marking each one of them (each statement of a right.) Defendant also stated that he was going to continue talking to the police." *Id.*, at 29. More so, Agents Ruiz and Sáez both testified that at all times defendant was cooperative, attentive, coherent, even offered to make a drawing to make himself understood and never showed hesitation or reluctance to participate in the interview. Actually, the testimonies on record reflect that defendant volunteered personal information about his experiences in prison, his interest in boxing and his upbringing. **ECF No. 120** at 28, 33. This makes evident that defendant felt at ease and in control and that his actions were completely free of coercion.

Since the record does not contain a single unambiguous invocation of defendant's Fifth Amendment right to remain silent, *Mosley*'s test (for cases where a suspect under interrogation

changes his unambiguous invocation of rights) is inapplicable. The evidence and testimony evincing that defendant waived his rights surpasses the preponderance bar by a wide margin. The totality of circumstances in this case show that defendant as well waived his right to remain silent and did so with full knowledge of its consequences. Thus the motion to suppress on this ground is also **DENIED**.

### B. Defendant knowingly and voluntarily waived his Fifth Amendment rights.

**1. Defendant understood the *Miranda* rights and the significance of the waiver; and**
**2. Defendant was not interrogated in a coercive environment such as to render his statements involuntary**[22]

Defendant's second argument is that his statements should be excluded because the PRPB obtained them in violation of his Fifth Amendment rights "given that he did not knowingly and voluntarily waive them." **ECF No. 79** at 11. Defendant argues that he has a history of intellectual disability with a diagnosis of attention deficit disorder, and a Full-Scale I.Q. (intelligence quotient) in the range of 66-74, **ECF No. 79-4** at 3, which allegedly places him in the "borderline intellectual functioning range" scoring in the second percentile which means "that 98% of adults in his age group have greater intellectual capacity." The defense argues that these deficiencies, together with the fact that he never learned to read and write, place him at a higher risk of suggestibility by authority figures. *Id.*, at 12. Accordingly,

---

[22] Although defendant separated the discussion of these two arguments in two subsections, *see* **ECF No. 79** at 13 and 18, the Court will discuss them together because both have the same legal standard, and they both rely on the exact same grounds and facts.

defendant contends that his diminished intellectual ability and the fact that he consumed crack cocaine the day before the interrogation "prevented him from adequately understanding his Fifth Amendment rights." *Id*., at 13. Consequently, defendant argues that his waiver of rights was neither knowing nor voluntary. *Id*. Citing out-of-circuit cases, the defense seems to suggest that people with low I.Q. cannot knowingly and voluntarily waive constitutional rights.

Finally, in an effort to address the totality of circumstances, the defense adds several factors to argue that defendant's ability to knowingly and voluntarily waive his rights was diminished. To wit, the defense asks the Court to place extraordinary weight on the fact that: (1) defendant cried at the time defendant waived his rights and made statements to the police, *id*., at 16, and (2) that he had used crack cocaine the day before. *Id*. These arguments fail to carry the day.

### (i)    Defendant's I.Q.

The determination of a valid waiver of rights "depends on whether the waiver was knowing and intelligent, given the totality of the circumstances and the facts surrounding the particular case, including the background, experience, and conduct of the accused." *United States v. García*, 983 F.2d 1160, 1169 (1st Cir. 1993) (quoting *United States v. Butler*, 441 U.S. at 374–75). Addressing the particular arguments in this case, this Court notes that "[t]here is no hard and fast rule as to when someone with limited cognitive functioning can knowingly and intelligently waive *Miranda* rights. Such personal traits are a relevant piece of the overall

inquiry into the totality of circumstances." *United States v. Campbell*, 2009 WL 1106769, at *5 (D.R.I. 2009) (citing *United States v. Rojas–Tapia,* 446 F.3d 1, 7–8 (1st Cir. 2006)). In other words, "mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness." *Id.* at 7.

> As to the proper totality-of-circumstances analysis, for decades courts have looked at:
>
> defendant's cognitive ability, prior experience with the criminal system, evidence of police trickery or coercion or undue pressure, lack of water or sleep or food, evidence of a language barrier, a defendant's own words, the length of the interrogation, whether weapons were drawn, the number of officers present, and a defendant's demeanor and ability to articulate as described by law enforcement and others.

*United States v. Campbell*, at 5 (quoting *United States v. Rojas–Tapia,* 446 F.3d at 7–8).

Unfortunately, even though the caselaw in the First Circuit clearly establishes that the above *numerus apertus* list of factors is necessary for the inquiry into a knowing and voluntary waiver, defendant does not adequately address them in his motion to suppress. Instead, as discussed before, for the most part defendant relies on his low I.Q. and only superficially mentions his illiteracy, the fact that he cried during the interview, and the use of drugs the day before the interview as additional factors. But these factors in either isolation or in conjunction are insufficient in light of the totality of circumstances encountered in this case.

It is black letter law in this Circuit that "low I.Q., standing alone, is not dispositive of the waiver determination." *Rojas-Tapia*, 446 F.3d at 7.[23] Notably, in *Tapia-Rojas* the Court made its determination considering that the defendant had an I.Q. of 71 and was found to have "poor range of intellectual functioning, rating in the 3rd, 2nd, and 5th percentile…" *Id*., at 7. As a matter of fact, the defendant was also "borderline" intellectual functioning. *Id*. Although *Tapia-Rojas* has several factual similarities, the real importance of that opinion to this case resides not in factual parallels but rather in its holding stating that regardless of the borderline intellectual functioning finding, "[t]he waiver inquiry ultimately turns not upon any one factor, but upon all the attendant circumstances." *Id*., *see also United States v. Rang*, 919 F.3d 113, 120 (1st Cir. 2019) *cert. denied*, —— U.S. ——, 140 S.Ct. 44, 205 L.Ed.2d 158 (2019)(holding a "borderline intellectual functioning" defendant properly waived his *Miranda* rights); *United States v. Rosario-Díaz*, 202 F.3d 54, 69 (1st Cir. 2000)("[defendant]'s I.Q. was in the middle 70s and… had no prior involvement with the criminal justice system" found to have constitutionally waived her Fifth Amendment rights).

Likewise, defendant's claim of being prone to suggestibility or other disadvantages related to his mental capacity related to his "borderline intellectual functioning" is neither determinative here. At the outset, the "Constitution guards against compulsion by the state,

---

[23] In the verbal I.Q. index, defendant scored in a range of 67 to 77, a three-percentile rank. **ECF No. 137** at 25. In the performance I.Q. index, defendant scored in a range of 68 to 81, a four percent rank. *Id*. In the full-scale I.Q. defendant scored between 66 to 74 with a two-percentile rank. *Id*., 26. However, as it relates to "perceptual organization," and "perceptual ability, visual perception and the ability to discern the essential from the non-essential," defendant scored in the 10% percentile range.

not poor decision-making by defendants." *United States v. Rang*, 919 F.3d 113, 120 (1st Cir. 2019) *cert. denied*, ––– U.S. ––––, 140 S. Ct. 44, 205 L.Ed.2d 158 (2019). In *Rang*, the First Circuit also held that a "borderline intellectual functioning" individual validly waived his Miranda rights. Among other factors considered by the First Circuit, like the defendant in this case, Rang had previous experience with the criminal system. But even if defendant had no such prior experience, a finding of knowing, intelligent, and voluntary waiver would still be feasible. *See Rosario-Díaz*, 202 F.3d at 69 (finding a knowing, intelligent, and voluntary waiver even though defendant's I.Q. was in the "middle of the 70s" and had no "prior involvement with the criminal justice system").

### (ii)    Findings in the Psychodiagnostic Evaluation Report

Even though the above discussed factors suffice to deny defendant's motion, the Court will also address certain aspects of the psychodiagnostic report submitted by the defense for suppression purposes without losing perspective that the findings in the report are but one factor of many that the Court must consider, and that defendant's psychodiagnostics evaluation was not performed to measure his state of mind, capacity or willingness to make statements to the PRPB but rather his competency to stand trial.

The defense highlights the following findings of the report: "At age 30, Mr. Payne obtained a Full-Scale I.Q. in the range of 66-74." ECF No. 79 at 12. Defendant's "score also placed him in the borderline intellectual functioning range that, as will be discussed, predisposes him to a higher risk of suggestibility by authority figures." Id. He also "scored in

the second percentile, which means that 98% of adults in his age group have greater intellectual capacity than him." Id. The expert found that defendant's "attention span, learning capacity, communication ability, and working memory" were affected. Id. Defendant's "verbal comprehension skills are low: 71-83 (5th percentile)." Id. "[H]is processing speed, which measures his ability to understand information visually… is significantly lower: 53-72 (0.2 percentile)." Id. "[Defendant's] mental health conditions interfere with his ability to exercise good judgment[…] and interfere with his ability to generate multiple options when analyzing a situation and examining the advantages and disadvantages of these options." Id., at 18.

But the report and the testimony of the expert on cross examination shed light on additional information that suggests that defendant's lack of mental acuity is not as dire as the defense would have the Court believe. To wit, the expert concluded that defendant was competent to stand trial, was able to consult with counsel, and understand pleas, courtroom proceedings, and trial.

As to this aspect of defendant's cognitive and mental abilities to enter pleas and defend in criminal proceedings, the Court asked the defense's expert:

When you say to 'understand pleas,' that means that he knows what -- between two options which seems to be the better one.

THE WITNESS: Yes.
THE COURT: And he can make a choice accordingly.
THE WITNESS: Yes.
THE COURT: And he understands my role here as a judge.
THE WITNESS: Yes, he does.

THE COURT: He understands your role as a psychologist and whenever he sees you again he knows what your role is and in what context you interviewed him.

THE WITNESS: I had to explain that again. He didn't remember meeting me the second time.

THE COURT: The second time. But as soon as you began explaining it to him, he understood?

THE WITNESS: Yes.

THE COURT: Okay. And actually when you told him the scope of interview, he understood that.

THE WITNESS: Yes.

*Id.*, at 44-45. Aside from his ability to understand trial and reach pleas, the expert testified that defendant was able to understand her role, obtain his consent, and conduct all tests and interviews in a single session with the defendant that lasted a total two and a half hours. Id., at 43. Based on the expert's testimony, during that period of time defendant reacted in a similar fashion than when interviewed by Agent Sáez: was cooperative, paid attention, but also got distracted and talked and volunteered information on unrelated subjects.

Furthermore, the expert explained that defendant was mentally fit enough to provide a detailed background of his education, upbringing, and his relationship with the persons that took care of him. Id., at 46. As to her clinical findings, the government obtained the following answers from the expert on cross examination:

Q. Isn't it true that in the domains of cognitive functioning Mr. Payne scored highest in perceptual organization?

A. Yes.

Q. And perceptional organization includes picture completion, correct?

A. Yes.

Q. Isn't it true that Mr. Payne's second highest score in domain was verbal comprehension?

A. Yes.

Q. And you performed a summary of cognitive functioning, correct?

A. Yes.

Q. And your summary of the cognitive functioning was that his cognitive functioning was competent with only borderline intellectual functioning, right?

A. Yes.

Q. But this is less severe than intellectual disability, right?

A. Correct.

Q. And within intellectual disability there are different levels –

A. Yes, they are.

Q. -- like mild, moderate, or severe.

A. Yes.

Q. But Mr. Payne is not in that realm, right?

A. No

**ECF No. 137** at 114-15. Moreover, and of particular relevance here, the expert explained that defendant was capable of understanding and actually understood the pros and cons as well as the consequences of a plea deal, which of course includes a myriad of waivers of constitutional rights. See *id.*, at 54 ("Q. And that he understands the repercussion of a plea deal. A. Yes. Q. And he understands the consequence of going to trial? A. Yes.").

Much like the First Circuit's conclusion in Rojas-Tapia, in this case, "[g]iven these factors, we conclude that even assuming the medical evidence of [defendant]'s intellectual limitations—specifically, relatively low I.Q.—were to be credited, those limitations did not result in a confession which was other than knowing in the constitutional sense." *Rojas-Tapia*, 446 F.3d 8. "To show a knowing waiver, the government need only demonstrate that the defendant knew that he could remain silent and request a lawyer and that his statements

could be used against him." Rang, at 30. Thus, even if defendant had "expressed confusion" as to some of his rights or criminal proceedings (which de did not), "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Therefore, the government exceeded the preponderance standard in showing that defendant waived his rights knowingly, intelligently, and voluntarily.

### (iii)   Defendant's emotional state and educational background

Moreover, the fact that defendant was "distraught" as described in the motion suppress (presumably alluding to the fact that he cried[24] and had used drugs the day before[25]) is not dispositive. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)("a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry"). Aside from being handcuffed, defendant does not point to a single factor for the Court to determine

---

[24] According to Agent Ruiz's testimony, defendant cried at some point, because he did not want to go to jail. **ECF No. 120** at 34. According to Agent Sáez, defendant cried at the inception of the interview when questioned about his educational background and while admitting that he did not know how to read or write. *Id.*, at 122. Under either scenario, what the record reflects is that defendant cried at a given point of the interview (not throughout or "during the interrogation" as occasionally asserted by defense counsel. **ECF No. 79** at 12). Still, it was the testimony of Agent Ruiz that defendant was given time to compose himself before proceeding with the interview. **ECF No. 120** at 62.

[25] Drug use alone does not invalidate *Miranda* waiver. Much less in this case where a day had elapsed from the time of the drug use and the interrogation and waiver. Here, the evidence shows that defendant was responsive, alert, and cooperative at all times relevant. *See United States v. Byrne*, 83 F.3d 984, 989 (8th Cir. 1996) (finding that defendant after taking the drug methadone, made voluntary statements; *United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000)(finding valid waiver where defendant was a heroin addict in withdrawal and under the influence of anti-depressants at the time of his interrogation)). In spite of a detailed cross-examination, both agents present at the interview agreed that defendant did not look confused, dizzy, weakened or were there any visible signs of withdrawal. **ECF No. 120** at 27, 30-33, 62, 77, 80 and 85.

that he was coerced in any way, shape, or form. "The touchstone of voluntariness is whether coercive police activity overbore the will of the defendant such that the statement was not [a] free and voluntary act…" *Procunier v. Atchley*, 400 U.S. 446, 453 (1971). To the contrary, the totality of circumstances underlying defendant's statements to the police (described below) shows that the January 10, 2020 interview was not coercive at all.

As to his illiteracy, the defense asserts that defendant does not know how to read and write and that such deficiencies somehow (the defense does not explain exactly how) affected his ability to waive his constitutional rights or how his ability to learn and recall from prior experience was affected, contrary to what defendant asserted. However, the testimonies of Agent Sáez and Agent Ruiz, show that the PRPB read him the entire content of the *Miranda* Form. Furthermore, the testimonies show that the agents read out loud the *Miranda* Form line by line and paused in between to ask defendant if he understood what was read to him. Likewise, the uncontroverted testimony corroborates that the agents read back to defendant the notes memorializing defendant's answers to their questioning and that the defendant signed the document with the notes agreeing with the content. More so, defendant volunteered to make a drawing of the crime scene "to make himself understood during the interrogation." Such drawing exhibited details consistent with his diagnosed ability to discern "the essential from non-essential." Thus, none of the factors proffered by the defendant suffice to deem his waiver not knowing, intelligent, or involuntary.

A review of all material facts and circumstances in this case shows quite the opposite of what the defense intends to portray. According to the testimony, defendant was sitting down facing one PRPB officer (Agent Sáez) while two other officers were around the office. No weapons were drawn during the interrogation. All three agents were wearing civilian clothing. **ECF No. 120** at 9. The PRPD officers moved defendant's handcuffs to the front to allow defendant more hand movement. *Id.*, at 29. The interrogation lasted approximately two hours and only one officer was doing the questioning. *Id.*, at 50. Defendant was arrested only a couple of hours earlier that day and was offered something to eat and drink during the interview and given something to eat at the end of the questioning. *Id.*, at 83. Although defendant mentioned having used crack cocaine the day before, the testimony of both witnesses at the suppression hearing proves that he did not exhibit any withdrawal symptoms.[26] *Id.*, at 27, 68, 77. Defendant was alert and responsive of the situation and was described by Agent Sáez as being coherent and present "in time and space." *See* **ECF No. 120** at 27, 77, 80 and 93. The interview was conducted in the Spanish language and defendant was

---

[26] Specifically, Agent Sáez testified:

> Q. Do you have any experience with people that are experiencing withdrawals from using drugs?
> A. Yes.
> Q. And in your experience, what are some of the signs of withdrawal?
> A. Well, that they're sleepy, that they answer incoherently, that they don't understand my question.
> Q. And did Mr. Payne give you any of those indications?
> A. No.
> Q. How did he seem at the time that you were explaining the warnings to him?
> A. At all times he was alert, paying attention.

**ECF No. 120** at 80-81.

read and explained his rights verbally in the Spanish language. Defendant was alert and

coherent enough to place his initials on the *Miranda* Form, make markings, and sign the

document. Moreover, he was lucid enough to make two drawings of different events related to

the charges and the crime scene. *Id.*, at 31-32 and 89-90.

Moreover, defendant's answers contained detailed facts and chronology and other

significant details showing that defendant had the ability to perceive and recall details.

Specifically, the fact that defendant was able to describe with detail the events that took place

on January 7 to January 10 tends to show that defendant understood his decision to talk to the

police and the consequences of such actions. The details defendant was providing as to the

events lead agent Sáez to believe the defendant because those details were consistent with the

results of the investigation they had conducted prior to defendant's arrest. *Id.*, at 90.[27] Actually,

he expressed he knew and understood that "both" (he and his friend Eric De Jesús) would

have to "serve [time]." On top of this all, defendant informed the PRPB officers of his prior

experience with the criminal system.

In addition to the aforementioned factors, the Court takes note of the mental agility

with which defendant made his statements. To wit, defendant was intellectually and verbally

fluent enough to incriminate Eric De Jesús, plead ignorance of the details of the homicide, ask

---

[27] Defendant was able to draw the carport, double doors and rear part of the victim's body was located. Defendant also alluded to and described what he had observed on his surroundings on the day of the events: a person standing nearby, described a nearby vehicle, admitted having helped his brother push and throw a purse thru the vehicle's window and noticed that a picture of them had been taken. Prior to interviewing defendant, throughout their investigation; law enforcement agents had been able to identify or locate those individuals and/or corroborate the narrated events.

about and manifest concern as to the well-being of his other friend (Ana Del Pilar, one of the two passengers that he left behind when he crashed the stolen car and fled the police on foot on January 9, 2020)), and alluded to the all potential criminal responsibility of others. *See* **ECF No. 113-1** at 2-5. Without a doubt, the evidence and the testimony show that defendant understood the predicament he found himself in and had decided to "surrender" while knowing that this meant he could end up "serving time" after having fled from the police and absconding for a day. The totality of circumstances demonstrates defendant knew the consequences of his voluntary actions and was not in a coercive environment.[28]

## VI.    Conclusion

In light of all the above, the Court hereby **DENIES** defendant's motion to suppress at **ECF No. 79.**

**SO ORDERED**.

At San Juan, Puerto Rico, on this 19th day of May, 2025.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**

---

[28] Aside from being handcuffed, the Court cannot find in the defense's motions any indication of coercion whether physical or emotional by the law enforcement agents.