THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

v.

JOSEPH PAYNE-PABON,

Defendant.

Crim. No. 22-229 (ADC)

## OPINION AND ORDER

Before the Court is the United States of America's ("government") motion *in limine* to preclude defendant Joseph Payne-Pabón's ("defendant") from introducing expert testimony. **ECF No. 259**. Defendant seeks to introduce the expert testimony of Mr. Gerald S. Cole ("Mr. Cole") as a latent print examiner. **ECF No. 254**.

For the reasons below, the Court **GRANTS** the government's motion *in limine*.

I. **Relevant Procedural Background**

On June 3, 2025, the Court issued an Order that allowed defendant until June 9, 2025 "to notify disclosure of his intent to introduce an expert witness under Fed. R. Crim. P. 16, without prejudice to any challenge the government may raise." **ECF No. 240**. The Court granted defendant this opportunity because on May 29, 2025, the government disclosed, as part of a Rule 16 disclosure letter including materials to be used in its case-in-chief at trial, a one page certificate of analysis dated May 23, 2025, containing the results of a print analysis performed by Puerto Rico Police Agent Pedro J. Chévere Rosado ("Agent Chévere") on a fragment of a

print found in an apparent blood stain that was located on a wall of the victim's house. *See* **ECF No. 226**. The results indicated that the print fragment lacked sufficient adequate information to perform a print comparison.[1] Although the government later informed the Court and defendant that neither Agent Chévere nor his print analysis would be part of its case-in-chief, the Court considered that the documents fell under Rule 16 because they could be material to defendant's defense. For that reason, the Court found it appropriate to grant defendant "*some* time to consider this new development." **ECF No. 240** at 3.

On June 8, 2025, defendant filed a notice of intent to present the expert testimony of Mr. Cole as a fingerprint expert. **ECF No. 254**. His proffered opinion testimony, as described in the notice, is summarized as follows:

> (1) the print analysis he performed on the print fragment in apparent blood that the police recovered from the white paint on the wall of the hallway in the area of the stairs of the victim's residence; (2) his findings that the print fragment contains friction ridge detail consistent with a finger, palm, or footprint; and (3) that there is no indication that any type of hand or foot covering was used to conceal the ridge detail.

**ECF No. 254** at 1.[2] According to the notice, Mr. Cole's opinion is based on the following:

> [H]is observations of ridge detail on the print, including ending ridges, apparent thickness of the ridge detail, ridges that stop abruptly then continue, and what appears to be bifurcation. Further Mr. Cole did not observe a fabric impression or

---

[1] The government explained that the analysis was commissioned in response to defendant's April 30, 2025 subpoena to Agent Chévere to testify at trial. **ECF No. 233** at 2. It further explained that the certificate of analysis came as a result of its request for documentation regarding a previously made (but admittedly undocumented) conclusion by the Puerto Rico Police that the print lacked comparative value. *Id.*

[2] The first listed item is not really an "opinion" as there is no description of what Mr. Cole's "print analysis" concluded. The more logical way to read this proffer is to focus on the second and third items as his opinions.

any type of impression that led him to believe there was some type of hand or foot covering when the impression was made.

*Id.*, at 2. The relevance of this testimony, as explained to the Court, is that government witnesses will identify defendant as wearing a glove or gloves (or as being in possession of a glove or gloves) in the victim's vehicle some time after her death. The defense intends to rebut the implications stemming from this testimony with Mr. Cole's expert opinion that the partial print was made by someone who was not wearing any covering.

On June 9, 2025, the government moved to exclude the proposed expert testimony. **ECF No. 259**. It argued that the notice was deficient insofar as the "opinions that [d]efendant intends to elicit… are incredibly vague and irrelevant to the issues that the jury must analyze. The nature of the analysis is unknown. There is no way for the [g]overnment to evaluate the methodology used." *Id.*, at 2. It further argues that the proffered testimony lacks relevance and probative value, as it would not "make it more or less likely that [d]efendant committed the offense or that would make the inconclusive print probative of any relevant fact." *Id.* It argues that defendant was observed wearing gloves in a different location and at a different time, attenuating the relevance of the partial print found in the blood stain. *Id.* Alternatively, the government requested disclosure of *Jencks* material, "including any notes and communications authored by

the witness" given the lack of a written report. *Id.*, at 3. It also asked leave to call its own witness "as needed to clarify any confusion created by the defense expert's testimony." *Id.*[3]

On June 10, 2025, defendant responded to the government's motion. **ECF No. 260**. He defended the sufficiency of his expert disclosure under Fed. R. Crim. P. 16(b)(1)(C)(iii) on the grounds that it provides enough detail about Mr. Cole's opinion and adequately describes the bases for the opinion. *Id.*, at 2. Defendant also suggested that the issue of whether the print fragment has comparative value or not, can be addressed through cross-examination or a rebuttal expert. *Id.*, at 2-3.

That same day, the Court informed the parties that it would hold a *Daubert* hearing. **ECF No. 262**.[4] The hearing was held on June 13, 2025, in the afternoon outside the presence of the jury. Mr. Cole was called to the stand and sworn in. *See* Transcript of *Daubert* Hearing, June 13, 2025, **ECF No. 287** ("Cole Tr.").[5] The Court adjourned and reserved its decision on the admissibility of defendant's expert witness.

---

[3] The government referred to Agent Chévere as a possible expert witness, alluding to the lack of prejudice to defendant because he previously subpoenaed him and claimed that no expert report was needed from him. **ECF No. 259** at 3, n.2.

[4] A *Daubert* hearing, in reference to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), is "'an evidentiary hearing . . . used by district courts to resolve factual issues related to admissibility' of expert testimony." *United States v. Crater*, 93 F.4th 581, 590 (1st Cir.), *cert. denied*, 145 S. Ct. 218 (2024) (quoting *Santos-Arrieta v. Hosp. Del Maestro*, 14 F.4th 1, 5 n.11 (1st Cir. 2021)).

[5] References to the *Daubert* hearing transcript shall be as follows: "Cole Tr., **ECF No. 287**, at [page : line] to [page : line]."

## II. Legal Standard

"The Supreme Court . . . explained in *Daubert* . . . that Rule 702 assigns a 'gatekeeping role for the judge' to determine whether 'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Jackson*, 58 F.4th 541, 550 (1st Cir. 2023) (quoting *Daubert,* 509 U.S. at 597). Federal Rule of Evidence 702 sets forth the guidelines for admissibility of expert testimony and sets forth four requirements for it to be admissible, which must be established by preponderance of the evidence. Fed. R. Evid. 702.[6]

First, "the expert's scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Thus, the trial court must determine that the proffered expert witness is "qualified as an expert by knowledge, skill, experience, training, or education" before permitting his or her testimony to be presented to the jury. Second, the testimony must be "based upon sufficient facts or data." Fed. R. Evid. 702(b).

Third, it must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Pursuant to *Daubert*, the Court evaluates the expert's methodology in light of the following factors: whether the expert's technique or theory can be or has been tested; whether the technique or theory has been subject to peer review and publication; what the known or potential rate of error of the technique or theory is when applied; whether the expert maintained

---

[6] Rule 702 was amended in December 2023 to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirement set forth in the rule." Fed. R. Evid. 702 Advisory Committee Note to 2023 amendments.

standards or controls; and whether the technique or theory has been generally accepted in the scientific community. *See United States v. Valdivia*, 680 F.3d 33, 57 (1st Cir. 2012) (citing *Daubert*, 509 U.S. at 593-95); *see also United States v. Casey*, 928 F. Supp. 2d 397, 398 (D.P.R. 2013) (reciting factors). Fourth and last, the expert witness must have "applied the principles and methods reliable to the facts of the case." Fed. R. Evid. 702(d).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Smith v. Jenkins*, 732 F. 3d 51 (1st Cir. 2013) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (internal quotations omitted)). Rather, the Court can "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *General Elec. Co.*, 522 U.S. at 146). *Daubert* does not require the Court to ignore other evidentiary rules, and "*Daubert* issues… frequently collide in practice with the requirements of other rules of evidence, especially Fed. R. Evid. 403." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81–82 (1st Cir. 1998).

III. Discussion

A. The proffered scope of Mr. Cole's expert opinion.

The Court finds it necessary to first establish the context of Mr. Cole's proffered testimony within the chain of motions and disclosures filed by defendant. Notably, the scope of Mr. Cole's proffered testimony now exceeds that of the recently disclosed information in Agent Chévere's print analysis that first motivated the defense to present expert testimony. In his *Motion in*

*Compliance* dated June 3, 2025, defendant argued that Agent Chévere's print analysis were material "if only so that the defense could be allowed to obtain an independent expert opinion **regarding the fingerprint's suitability for comparison**," and complained that he was being forced to "take the government's word for it." **ECF No. 230** at 6 (emphasis added). In his *Ex Parte Motion in Compliance*, filed on the same day, defendant explained to the Court that he was evaluating whether to call Agent Chévere to testify on his conclusions "or to retain an expert witness to review them and expand on relevant information." **ECF No. 231**. The Court allowed defendant until June 9, 2025, to file a notice of expert testimony, but cautioned that it "harbor[ed] doubt as to whether additional expert evidence is at all necessary." **ECF No. 240** at 3, n.3.

However, defendant's June 8 notice and Mr. Cole's testimony at his *Daubert* hearing evince that he does not intend to present expert evidence on Agent Chévere's conclusion about the suitability of the partial print for comparison. Rather, the intention is to introduce Mr. Cole's expert opinion to the effect that the partial print found in the blood stain is not consistent with a glove or some other covering.[7] The question is thus whether Mr. Cole is qualified to give such an opinion.

---

[7] Mr. Cole at first testified that he was "requested to examine a photograph of what appears to be a red substance resembling blood. Whether or not that photograph depicts some type of friction ridge detail, otherwise some -- could be either fingerprint, palm print, or a sole." Cole Tr., **ECF No. 287**, at 3:21-25. He later added that he was also asked to "[d]etermine if [he] could detect any type of hand covering . . . ." Cole Tr., **ECF No. 287**, at 34:8-15.

**B. Mr. Cole's expert qualifications and his testimony's helpfulness to the jury.**

In his *Daubert* hearing, Mr. Cole identified himself as a latent fingerprint identification consultant. Cole Tr., **ECF No. 287**, at 3:14-15. Mr. Cole gave a summary of his qualifications, which are also contained in his *curriculum vitae* attached to the June 8 notice provided by defendant. *See* **ECF No. 254-1**. As far as professional experience, Mr. Cole's began with his initial training in the Federal Bureau of Investigation's identification division in 1959, where he "compar[ed] fingerprints that were submitted from all over the world." Cole Tr., **ECF No. 287**, at 4:14-15; 5:10-112; 14:23-25; *see also* **ECF No. 254-1** at 3. He later spent ten years with the Dade County Sheriff's Office until 1970, spending "three to five years" under the direction of a senior latent print examiner learning the trade. Cole Tr., **ECF No. 287**, at 4:15-17; 5:12-14. He then moved to Lakewood, Colorado for a year to establish a fingerprint or technical section within its police department. *Id.*, at 4:18-21; **ECF No. 254-1** at 3. Afterwards, he spent the next 30 years employed by the United States Secret Service, Forensic Services Division, until retiring in 2001. Cole Tr., **ECF No. 287**, at 4:18-21; **ECF No. 254-1** at 2.

Post-retirement, Mr. Cole worked for the Fairfax County Virginia police department in Virginia until 2007, when he moved to the Montgomery County police department in Maryland until 2008. Cole Tr., **ECF No. 287**, at 4:25 to 5:3; **ECF No. 254-1** at 2. From 2008 to 2017, he was an International Association for Identification-certified latent print identification consultant, but he let his certification lapse in 2017 because he "was in private practice and . . . didn't think it was necessary." Cole Tr., **ECF No. 287**, at 13:22 to 14:11; **ECF No. 254-1** at 2. He mentioned

having attended "numerous training seminars offered by identification groups such as the International Association for Identification, Florida division of the IAI, the Chesapeake Bay division of the IAI…." Cole Tr., **ECF No. 287**, at 5:18-22. He also stated that he was an instructor in "the police academies in Dade County, Montgomery County, Maryland, Fairfax County, Virginia, as well as the Secret Service Basic Agent Class, as well as the Senior Agent Class." *Id.*, at 5:23 to 6:1. But since 2017, he has not attended any continuing education courses. *Id.*, at 15:1-3.[8] He has no publications of his own, although he has "assisted in publications," none of which are listed in his *curriculum vitae. Id.*, at 33:2-10.

Considering the above experience and training, Mr. Cole would likely be qualified as an expert on latent fingerprint identification.[9] However, Mr. Cole's opinion is not proffered for fingerprint identification purposes, but rather to diminish or exclude the possibility that print fragment found in the apparent blood stain here was left by someone wearing a glove or other type of covering. There is a subtle but important difference between identifying and matching a latent print left on a surface and determining how it was left there. This nuance makes all the difference where, as here, the expert was allowed to be noticed, as an exception, after the

---

[8] Mr. Cole testified that he keeps abreast of recent developments by reading a publication issued by a government agency based in Bethesda, Maryland that "more or less monitors the forensic disciplines" part of which includes fingerprints. Cole Tr., **ECF No. 287**, at 27:17 to 28:15. He was unable to recall the name of the organization and did not provide information as to its publication frequency or how often he reads it. *Id.* He limited himself to say he reads such publications "whenever they come out." *Id.*

[9] At the end of his first redirect examination, defense counsel proffered Mr. Cole "as an expert in fingerprint analysis, or in print analysis, I should say." This variation likely corresponds to Mr. Cole's "professional guess" that the print at issue "would appear to [him] to be a palm print." Cole Tr., **ECF No. 287**, at 40:12-19; *see also id.*, at 31:16-17 ("It resembles, resembles a possible palm print. Can't say for sure, but it resembles that.").

commencement of trial and due to a very specific disclosure concerning the lack of the print's suitability for comparison.[10] Even though "expert witnesses need not have overly specialized knowledge to offer opinions . . . . [A] district court acts properly by excluding opinions that are beyond the witness's expertise." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68 (1st Cir. 2006) (citing *Gaydar v. Sociedad Instituto Gineco-Quirúrgico y Planificación*, 345 F.3d 15 (1st Cir. 2003); Weinstein's Evidence, § 702.04[6] (2006)). And in response to questions posed by the government and by the Court—questions that went precisely to his knowledge, experience, and training on this specific topic—Mr. Cole demonstrated several shortcomings.

For example, Mr. Cole has seldom been asked to opine on whether a partial print was left by someone wearing a glove or other covering. Cole Tr., **ECF No. 287**, at 17:18 to 20:25. And when he was, it was in two or three state court cases between 1961 to 1970; thus, he has not testified as to the kind of print at issue here since 1970. *Id.*, at 22:12 to 23:13.[11] Furthermore, he

---

[10] On this last point, the Court is compelled to go back to the difference between the scope of Agent Chévere's print analysis and Mr. Cole's proffered opinion. As the government has pointed out, defendant had knowledge of the existence of the blood stain and photographs of it way before Agent Chévere's print analysis was performed and disclosed in late May. *See* **ECF No. 233** at 2 n.1 ("The existence of that evidence (piece of paint with blood) was disclosed in the first discovery package back in June 2022."); **ECF No. 234** at 4 ("[The defense] ha[s] had since 2022 close-up photos of the stain and apparent print.). The defense could have, and likely did, develop the lack-of-glove theory prior to Agent Chévere's late May testing and disclosure of the partial print. Indeed, the fact that the defense subpoenaed Agent Chévere in late April as a non-expert witness suggests that the lack-of-glove theory was already contemplated. And Mr. Cole's testimony that he was asked to opine directly on whether he could "detect any type of hand covering." Cole Tr., **ECF No. 287**, at 34:12-15. But the government's late-May disclosure of the print analysis seems to have given the defense an opening to piggyback an expert opinion on their theory. This likely explains why the scope of Mr. Cole's proffered opinion differs from mere latent print identification.

[11] Mr. Cole testified that he had worked on a case "where the subject wore gloves, however, he cut holes in the fingertips." Cole Tr., **ECF No. 287**, at 15:21-25. Later on, Mr. Cole testified that he had evaluated exterior glove prints or prints that were left with gloves or hand coverings about a dozen times. *Id.*, 30:21 to 31:6. The Court interprets this answer to refer to a print that does not have a ridge detail, different from the one at issue here. *Id.*, at 31:2-3.

admitted to not knowing whether a print can be left by a person wearing a glove. Cole Tr., **ECF No. 287**, at 15:15-17. And he testified that he did not know whether there was any technique or process dealing with prints left by a person wearing gloves. *Id.*, at 15:18 to 16:6. Mr. Cole has evaluated prints left with gloves or hand coverings in the past, but only around a dozen times in his multi-decade career. *Id.*, at 30:21 to 31:6. He has not, however, studied the difference between both types of prints, because he has never seen a print left by someone wearing a glove. *Id.*, at 16:18 to 17:15. He did mention that this would be "in the area of fabric impressions," which is something he has not studied. *Id.*, at 17:8-12. But he has simply "never seen a print with – somebody is wearing a glove and left an identifiable print. I've never had that occasion." *Id.*, at 17:5-7.

His knowledge of covered prints is likewise ambiguous or, at best, limited. When asked to describe what types of indications one would see "to conclude that a print or print fragment was covered," he described crosshairs or "a bunch of X's" as indications of a cloth glove, which were "[t]he ones that [he's] seen[.]" *Id.*, at 30:6-14.[12] As to plastic gloves, he was more equivocal: "Plastic gloves, to the best of my knowledge, just leaves a blob, but a blob can be anything also, so you can't be sure it's a plastic glove, it would be some type of hand covering." *Id.*, at 30:14-17. And, while he was firm in his opinion that he had never seen a print left by someone wearing a glove, he admitted that a palm print could be left by someone wearing an ill-fitting glove: "[I]f

---

[12] To be accurate, Mr. Cole also testified that he had had cases where "we've had toilet tissue around the pattern area of their finger to the first joint, as well as socks, stockings." Cole Tr., **ECF No. 287**, at 30:18-20.

it's ill-fitting and the palm is exposed in any way . . . maybe it's halfway – just where the fingers end and the palm is exposed. . . . It's possible. I would think one would think that." Cole Tr., **ECF No. 287**, at 40:20 to 41:4.

In sum, based on his experience and qualifications, the Court would have no qualms in qualifying Mr. Cole as an expert for purposes of giving an opinion on latent print identification, specifically, on the suitability of the partial print tested by Agent Chévere for comparison. But Mr. Cole is not being proffered to opine on this topic. He is being proffered to opine specifically on whether the print fragment indicates that it was left by someone wearing a glove or covering. On this topic, he did not establish that he had any particular knowledge, skill, experience, training, or education differentiating between those two types of prints. "The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue." *Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000). The Court has serious doubts as to whether Mr. Cole's opinion will be helpful to the jury.

The Court also doubts whether an expert opinion is even needed on this issue. It is not beyond common sense to infer that, as the defense posits, a person who wears a glove or hand covering would generally not leave a bloody finger or palm print on a wall. As Mr. Cole's own testimony shows, a cut, ill-fitting, or broken glove can expose the palm or finger and leave a print. A layperson does not need to hear scientific evidence to make this inference. "Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value." *United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994). In that sense,

allowing an expert to give opinion testimony on this matter is likely of little probative value and risks giving an undue and special imprimatur to Mr. Cole's opinion. Courts "do not . . . permit expert testimony when its subject is well within the bounds of a jury's ordinary experience and so it has little probative value but might unduly influence the jury's own assessment of the inference that is being urged." *United States v. Pires*, No. 24-1062, 2025 WL 1513556, at *12 (1st Cir. May 28, 2025) (cleaned up).[13]

The Court could stop here and exclude Mr. Cole's proffered testimony as unhelpful to the jury. Fed. R. Evid. 702(a). Nonetheless, the Court has additional concerns with regards to the reliability of the proffered opinion that will be discussed below.

### C. Reliability of Mr. Cole's opinion.

Under the remaining Rule 702 factors, the Court must evaluate the expert testimony's reliability. To be reliable, the expert's opinion must be based on sufficient facts or data, be the product of reliable principles and methods, and must reflect a reliable application of such to the facts of the case. Fed. R. Evid. 702(b)-(d).

Here, Mr. Cole testified that he was told by defense counsel that a report was not necessary and that he took no notes of his analysis. Cole Tr., **ECF No. 287**, at 23:18 to 24:1; 25:4-

---

[13] Expert testimony can carry with it an unwarranted aura of special reliability and trustworthiness . . . so courts must guard against letting it intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts. . . . Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.

*United States v. Soler-Montalvo*, 44 F.4th 1, 16 (1st Cir. 2022) (cleaned up).

5; 27:5-16. "Nothing reduced to writing," according to Mr. Cole. *Id.*, at 25:1-2. He "just made an observation and kept that in memory." *Id.*, at 24:11-13. Accordingly, the Court and the government are left only with Mr. Cole's testimony to determine whether his opinion is reliable.

According to his testimony, Mr. Cole received from the defense "three or four" photographs via e-mail containing images of the apparent blood and print. *Id.*, at 21:17-19; 33:11-24. He did not recall in what format he received them. *Id.*, at 21:8-16; 22:6-7.[14] Mr. Cole testified that the photographs he received from the defendant did not appear to be lacking in quality. *Id.*, at 22:10-11. Mr. Cole testified that he did not use any other material to form his opinion: "I based my responses solely on my examination." *Id.*, at 34:20 to 35:2.

As to the methodology he used to perform this examination, Mr. Cole at one point referred to the ACE-V method of fingerprint analysis. He testified that this stands for "Analysis, Comparison, Evaluation, and Verification," that it was a "method accepted within the field as the procedure or methodology to conduct an examination," and that he used it in his analysis for this case. *Id.*, at 8:15-22.[15] However, on cross examination, Mr. Cole admitted that he had not

---

[14] The only information on the type of format in which Mr. Cole received the photographs was given by the government, who proffered that counsel for defendant, AFPD Samuel Carrión, "told us that he provided the same PDF that he provided us." Cole Tr., **ECF No. 287**, at 21:17-19.

[15] "Numerous courts have found expert testimony on fingerprint identification based on the ACE-V method to be sufficiently reliable under *Daubert*." *United States v. Pena*, 586 F.3d 105, 110 (1st Cir. 2009) (collecting cases). The First Circuit has found that an expert's "conclusions ha[ve] a reliable basis in the knowledge and discipline of fingerprint analysis" when the expert employs all steps of the ACE-V method. *United States v. Vargas*, 471 F.3d 255, 259 (1st Cir. 2006). These steps include: (i) ensuring that prints are sufficiently clear; (ii) comparing prints by examining their characteristics and overall pattern; (iii) identifying at least eight matching characteristics between prints; and (iv) submitting the expert's conclusion to another examiner for verification. *Id.*

gone far in the ACE-V method because the print fragment was not suitable for comparison. *Id.*, at 12:3-12.

When questioned about *how* he employed the ACE-V methodology, Mr. Cole was unable to explain how his analysis fit squarely into the ACE-V framework. *See id.*, at 10:17-25-11:1, 11:25-12:2, 12:11-12. In fact, Mr. Cole testified that his analysis followed only the first and final step of the ACE-V framework, where Mr. Cole first observed that the print at issue was sufficiently clear for his analysis, and then submitted his conclusion regarding the print to another examiner colleague for verification. *Id.*, at 12:11-12, 26:5-7. The Court notes that neither Mr. Cole nor the examiner colleague are currently certified by any organization for their fingerprinting expertise. *Id.*, at 26:17-21. There is, by Mr. Cole's own admission, no documentation of his peer's review of his work. *Id.*, at 26:2-10. No other information was elicited to support the reliability of this verification process.

While the ACE-V method is recognized as the proper methodology for latent print experts to employ when analyzing a comparison between two prints, *see Vargas*, 471 F.3d at 265, here, the ACE-V method is a mismatch for the facts at issue because there exists no other print against which Mr. Cole can compare the photographs of the apparent blood and print. Mr. Cole's methodology, instead, appears to be an analysis of a photograph with a five-power magnifier and verification of his analysis by a similarly non-certified examiner colleague. Cole Tr., **ECF No. 287**, at 26:5-7. This may comply with two steps of the ACE-V method, but it is not the ACE-V method as fully applied. Mr. Cole does not offer any alternative, accepted method

that could have been applied in consideration of the specific characteristics of the print fragment at issue.[16]

Considering all of the above, the Court finds that while Mr. Cole performed some analysis based on the magnification of government's photographs of the blood stain, he did not properly apply any accepted methodology to formulate his opinion. He did not identify any particular methodology, save for a limited or modified ACE-V, for reaching an opinion on whether the print fragment exhibited indications of a glove or covering. And yet, he admittedly could not apply the ACE-V in full due to the characteristics of the partial print at issue.

---

[16] The Court also notes that, when asked to opine on how the print was left on the wall, Mr. Cole admitted to not being able to say with any certainty what may have caused the print to be fragmented, which goes both to his opinion's unhelpfulness to the jury and its lack of reliability:

> THE COURT: Okay. You mentioned that that print was kind of, if I may use the word, [fractured], and then it continued. So in your opinion, what may have caused that split in the print?
> THE WITNESS: The break in the print?
> THE COURT: Yes.
> THE WITNESS: I don't know, Your Honor. I would -- I was examining for any type of ridge detail. The break would be some type of distortion, it could be movement, it could be, ah, possible the liquid was not secreting at that point, it could be the substrate of the wall. **I cannot say with certainty what it was, why it caused that**. It could be the grasp, how one possibly touched that.
> THE COURT: So that someone possibly touched that.
> THE WITNESS: Possibly, yeah. At one time, that's ridge detail there, it was touched. **Never can be identified with that print**, but it was touched.
> . . .
> THE COURT: So inasmuch if you don't know what caused the breaking in the print, it could have been friction, could have been someone putting a hand, someone passing by, probably, if it's in a wall and I'm going upstairs, I can pass my shoulder, get too close, that could have broken apart the print.
> THE WITNESS: Your Honor, it's a haphazard motion. You just explained that person -- one is going down the stairs, it could have held on, ah, it could have been holding a child and held on with the other hand. **I will not say that this was – this particular impression was done at the same time that something nefarious was done – was happening**.

Cole Tr., **ECF No. 287**, at 35:3-20; 30:18 to 40-5 (emphasis added).

Importantly, his only peer review of his conclusion was made by an unidentified and non-certified latent print examiner colleague in Virginia. Boiled to its essence, Mr. Cole's opinion is based on his subjective appreciation of the photographs seen through the lens of his five-point magnifier and filtered through the prism of his experience. This raises serious concerns as to testability and verifiability of his technique or theory.

IV.   **Conclusion**

Having considered Mr. Cole's proffered opinion testimony under Fed. R. Evid. 702 and *Daubert*, the Court concludes that it must exercise its gatekeeping functions and exclude the testimony. The government's motion *in limine* at **ECF No. 259** is thus **GRANTED**.

**SO ORDERED.**

At San Juan, Puerto Rico, on this 18 th day of June 2025.

S/AIDA M. DELGADO-COLON
**United States District Judge**