**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA**

    **v.**

**JOSEPH PAYNE-PABÓN,**

    **Defendant.**

         **Crim. No. 22-229 (ADC)**

<u>**OPINION AND ORDER**</u>

**I.    Introduction**

On May 25, 2022, a grand jury returned a one-count indictment against defendant Joseph Payne-Pabón ("defendant"), charging him with committing a carjacking on or about January 7, 2020, that resulted in the death of Eulalia "Cuca" Combas-Sancho ("Ms. Combas"), in violation of 18 U.S.C. § 2119(3). **ECF No. 1**. Trial began on June 5, 2025. **ECF No. 249**. On June 18, 2025, after the close of the government's case-in-chief, defendant made an oral Fed. R. Crim. P. 29(a) motion for acquittal, which the Court denied. **ECF Nos. 299, 302**. Defendant then announced that it would not present any witnesses and rested. *Id.* Closing arguments were heard on the morning of June 20, 2025, and the jury was sent to deliberate. The jury returned a unanimous guilty verdict on the sole count in the indictment later that same day. **ECF No. 305**.

Before the Court is defendant's renewed motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c), filed on July 7, 2025. **ECF No. 314**. Defendant argues that the evidence against him was insufficient to establish beyond reasonable doubt that he (i) personally used

force, violence, or intimidation, (ii) acted with the specific intent to cause death or serious bodily harm, and (iii) that the vehicle was taken from the person or presence of the victim. The government filed a response in opposition on August 20, 2025. **ECF No. 329.**

Having considered the trial transcripts ("Tr.")[1] and the evidence on record,[2] the Court **DENIES** defendant's renewed motion for acquittal at **ECF No. 314**, for the reasons set forth below.

## II.      Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure permits a court to "set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." *Id.*, R. 29(c)(1). "A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge." *Id.*, R. 29(c)(3).

In reviewing a Rule 29 motion, a court considers the evidence "in the light most favorable to the government." *United States v. Gómez-Encarnación*, 885 F.3d 52, 55 (1st Cir. 2018). "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable

---

[1] Trial was held on the days of June 5, 6, 9, 10, 11, 12, 13, 16, 17, 18, and 20. References to the trial transcripts in this Opinion & Order shall be as follows: "Tr. [month]/[day], ECF No. [ ] at [page : line] to [page : line]."

[2] The documentary and photographic evidence admitted as exhibits at trial is on record with the Court. The government's exhibits will be referenced as "Gov't Exhibit [ ]" and defendants' "Def. Exhibit [ ]."

doubt." *United States v. Fernández-Jorge*, 894 F.3d 36, 42 (1st Cir. 2018) (citation modified). Thus, the analysis under Rule 29 "begin[s] by considering whether any rational fact-finder could have concluded beyond a reasonable doubt that" the defendant committed each element of the offense for which he was convicted. *Id.*, at 3. In doing so, the court "take[s] into account all evidence, both direct and circumstantial, and resolve[s] evidentiary conflicts and credibility disputes in favor of the jury's verdict." *United States v. Valerio*, 676 F.3d 237, 244 (1st Cir. 2012). "[A] guilty verdict may rest on reasonable factual inferences drawn from direct or circumstantial evidence, but not on insupportable or overly speculative evidentiary interpretations. . . . And, it is within the jury's purview to evaluate competing factual inferences and theories that are supported by the evidentiary presentation." *United States v. Ridolfi*, 768 F.3d 57, 61 (1st Cir. 2014) (citations omitted).

Ultimately, the court need only determine that the conviction "finds support in a plausible rendition of the record." *United States v. Shaw*, 670 F.3d 360, 362 (1st Cir. 2012). "Reversal is warranted only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt." *United States v. McDonough*, 727 F.3d 143, 152 (1st Cir. 2013) (citation modified).

III.    **Discussion**

Defendant's motion for acquittal is constructed around the elements of the federal carjacking statute, 18 U.S.C. § 2119. That statute reads as follows:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall--
>
> (1) be fined under this title or imprisoned not more than 15 years, or both,
>
> (2) if serious bodily injury (as defined in section 1365 of this title, including any conduct that, if the conduct occurred in the special maritime and territorial jurisdiction of the United States, would violate section 2241 or 2242 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
>
> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119. In order to find defendant guilty, the government needed to establish beyond reasonable doubt that: (i) defendant knowingly took the car from the person or presence of Mrs. Combas; (ii) that he did so by force; (iii) that the car had been transported, shipped or received across state or national boundaries; (iv) that defendant intended to cause death or serious bodily harm at the time he demanded or took control of the car; and (v) that death resulted. *See United States v. Castro-Davis*, 612 F.3d 53, 61 (1st Cir. 2010) (providing a similar enumeration of statutory elements).

Defendant's challenge to the verdict stands on three main grounds. First, that there was insufficient evidence to establish that he was the person who committed the carjacking and murder of Ms. Combas, a challenge he disguises as an attack on the "force and violence or by intimidation" prong of the statute. Second, that there was insufficient evidence to meet the specific intent element of the statute—*i.e.*, that he intended to cause death or serious bodily harm

when he took the vehicle. Third, there was insufficient evidence to establish that the vehicle in question was taken from Ms. Combas' person or presence.

For ease of analysis, the Court will first analyze the sufficiency of the evidence pointing to defendant as the perpetrator of the crime. That will entail a review of much of the evidence presented at trial. Then, with the benefit of having summarized a substantial part of the evidence, the Court will analyze defendant's remaining sufficiency challenges related to the specific elements of the crime.

### A. Whether the evidence was sufficient to identify defendant as the perpetrator of Ms. Combas' murder and carjacking.

Defendant contends that the evidence before the jury was insufficient to tie him to the murder of Ms. Combas and the theft of her white Hyundai Sonata.[3] Defendant relies on the lack of DNA or fingerprint evidence tying him to the victim, the scene, or the murder weapon. **ECF No. 315-1** at 6-8. He also points to the lack of eyewitness testimony tying him to the *inside* of Ms. Combas' home. *Id.*, at 7. However, an examination of the evidence, seen in light most favorable to the verdict, supports the conclusion that defendant was the perpetrator of the crime.

The Court offers, as a preliminary observation, that there is little direct evidence of the moment in which Ms. Combas was killed. As a way of background, Ms. Combas' body was

---

[3] Defendant frames his argument as being directed to the "use of force and violence or by intimidation" element of the statute, but in reality, it all revolves around whether the evidence pointed to him as the perpetrator of the crime. **ECF No. 315-1** at 6-8. In any case, as explained further below in the discussion of defendant's challenge related to the statute's specific intent prong, the Court finds meritless any argument that the evidence was insufficient to show that the perpetrator used force and violence.

found in her backyard in the early hours of January 8, 2020, concealed face down under a mound of cut grass and broken trash bags. *See* Tr. 06/07, **ECF No. 261** at 55:9 to 56:13, 69:5 to 72:5, 77:22 to 73:17 (testimony of San Juan Police Officer Phillipe Marrero-Flores). A heavy, blood-stained cement block with light-blonde hair was found some feet away from her body, nudged between a low cement wall at the end of the yard and partially hidden under vegetation. *Id.,* at 91:24 to 92:1, 106:21-24, 109:3-5, 111:15-24, 112:6 to 113:19 (testimony of Forensic Science Institute Investigator Angie Hernaiz-Rivera); Gov't Exhibits 53, 54. By the time she was found, she had been dead for several hours, but wounds were clearly visible: her nose was still bleeding, her left ear was mutilated, a head wound was evident, and bruising could be seen on her eyes, chin and mouth, and also on her leg's shin. *Id.,* at 72:2-5 (testimony of Officer Marrero), 114:18 to 115:9 (testimony of Investigator Hernaiz). Her white Hyundai Sonata was missing, along with her purse where she kept her keys. Tr. 06/06, **ECF No. 256** at 147:23 to 148:4, 154:8-21 (testimony of Mrs. María Lourdes Marrero-Combas, Ms. Combas' daughter); Tr. 06/07, **ECF No. 261** at 59:20 to 61:7 (testimony of Officer Marrero). Although plenty of evidence was recovered from the scene, Ms. Combas' murder occurred outside the presence of any cameras or witnesses. Therefore, the jury did not have all the conceivable details of Ms. Combas' murder at trial—details such as what words, if any, were exchanged between her and her killer, whether she had the opportunity to refuse the killer's demands or to flee or call for help, or details on the precise manner in which the killer struck Ms. Combas' fatal blows. But this, by itself, is no obstacle to upholding the verdict since juries can convict on circumstantial or indirect evidence alone.

"[T]he criminal law does not place a special premium on direct evidence." *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994). "The evidence in a criminal case should be viewed in its totality… for evidence—particularly circumstantial evidence—often has an exponential effect. After all, the sum of an evidentiary presentation may well be greater than its constituent parts." *Id.*, at 707 (cleaned up). *See also United States v. Clay*, 667 F.3d 689, 702 (6th Cir. 2012) (upholding verdict under 18 U.S.C. § 2119 based on circumstantial evidence of identification). As explained below, the volumes of evidence presented at trial pointedly mark defendant as the author of Ms. Combas' murder.

1. **Video evidence of defendant in Town Park on the morning of January 7, 2020.**

At trial, the government presented three videos taken from two properties in the Town Park neighborhood where Ms. Combas lived, one on Santiam Street and the other on the corner of Santiam and Trevi Streets.[4] These were taken from nearby home surveillance cameras in the morning and afternoon of January 7, 2020. The first two videos were taken from a neighbor's house on Santiam Street and show a man in a white, sleeveless tank top, shorts, and sandals walking down the street in the direction of Ms. Combas' house. *See* Tr. 06/07, **ECF No. 261** at 152:2-3; Gov't Exhibits 207, 208.[5] The man has long white socks and is wearing dark sandals, and

---

[4] Santiam and Trevi streets form part of the Town Park gated community. Trevi Street is a straight street that starts at the main entrance of Town Park and ends intersecting with Santiam Street. Ms. Combas' house is located diagonally across that intersection. *See* Gov't Exhibits 121, 121-D (showing location of Ms. Combas' house) relative to Santiam and Trevi Streets.

[5] The neighbor, Mr. Miguel Arocho-Rodríguez, testified that he reviewed his home security system's videos of January 7, 2020, after hearing of Ms. Combas' death and that he volunteered these videos to the police when they

he can be seen walking with a distinctive gait and holding something to his ear, like a cellphone. The time stamps on the videos show that they were recorded at 11:36am. Only one man was depicted in the videos. Another witness from the government, Ms. Ana del Pilar Santiago-Sayans, identified defendant in open court, without hesitation, as the man seen in the video walking down Santiam Street. Tr.  06/12, **ECF No. 276** at 109:12-19; Gov't Exhibit 209. Ms. Santiago's identification is significant because she is familiar with defendant, as he was raised by her father and stepmother. *Id.,* at 97:14-18. Indeed, she considered herself to be his sister. *Id.,* at 114:12-14. It is reasonable to think that she would be able to recognize defendant's personal traits and characteristics in the video.[6]

### 2. Testimonial evidence of defendant outside Ms. Combas' house on January 7, 20202, at or around 3:30pm.

The government offered the testimony of Ms. Combas' next-door neighbor, Ms. Inés Sánchez-Rivera to establish that Ms. Combas was at her home in the morning of January 7, 2020, and that she and other neighbors were meeting to deal with the island-wide blackout caused by a series of earthquakes that struck the southern part of Puerto Rico earlier that morning. Tr. 06/06, **ECF No. 256** at 75:4 to 77:18.[7] Ms. Sánchez testified how she again saw Ms. Combas alive

---

approached him searching for possible videos. Tr. 06/07, **ECF No. 261** at 148:12-18; 149:5-11. He singled out these videos because the man appearing in it did not look like he was "from around" the neighborhood and because he found it "not normal" for someone to be walking down that street talking on his phone on the day of the earthquake. *Id.,* at 149:1-4.

[6] In his motion, defendant consistently alludes to the notion that the videos are "blurry," but the evidence is on record and was able to be appreciated by the witnesses and the jury. While the face of the individual is not visible, his gait and clothing are clearly visible, as described by the witnesses.

[7] The Court took judicial notice of this event as the government's request. *See* **ECF Nos. 88, 93.**

at her house in the afternoon at around 3:00 or 3:30pm. *Id.*, at 77:19 to 80:5. At that time, Ms. Sánchez had gone over to Ms. Combas' house to connect an electrical extension cord from her generator to Ms. Combas' refrigerator. *Id.*, at 78:16 to 80:8. Ms. Combas told her that she was going to do some weeding in her yard before going over to her daughter's house. *Id.*, at 79:18 to 80:2. She then left to turn on her generator. *Id.*, at 80:19-21. Ms. Sánchez testified that Ms. Combas' car was in the carport when she left the house. *Id.*, at 80:14-16.[8]

Ms. Sánchez testified that she then called Mr. Gertrudis Fernández-Martínez, her handyman, to check on the generator because it was making some noises. *Id.*, at 80:19-24. Mr. Fernández agreed to come by the house to check.[9] *Id.*, at 81:6-8. Ms. Sánchez asked him if he could bring her gasoline, but he said he did not have the containers to do that, so Ms. Sánchez then left her house with her sister to buy gasoline. *Id.*, at 81:9-17. She was also shown an image from a video taken from a closely adjacent house's home security system overlooking Trevi Street that shows her leaving in her car at 3:32pm. *Id.*, at 82:6-11; Gov't Exhibit 197. An image from a video taken from the same camera shows that she arrived back at her house at 3:56pm. Tr. 06/06, **ECF No. 256** at 83:18 to 84:2; Gov't Exhibit 198. While on the stand, Mr. Fernández testified that he arrived at Ms. Sánchez-Rivera's house sometime around 3:30pm on January 7, 2020, to check on her electric generator. Tr. 06/12, **ECF No. 276** at 29:12-14. He parked his grey

---

[8] Although the trial transcripts use the word "carport," the area may likewise be perfectly described as an open driveway with a roof.

[9] Mr. Fernández also did gardening work for Ms. Combas. Tr. 06/12, **ECF No. 276** at 27:21-25.

pick-up truck in front of Ms. Sánchez-Rivera's driveway facing the direction of Ms. Combas'

house and carport. *Id.*, at 29:15-21. He testified that he then proceeded to wait for Ms. Sánchez-

Rivera in his car, because she had gone out to buy gasoline. *Id.*, at 30:6-10. He then testified that,

while he was sitting in his car facing Ms. Combas' house, he saw a dark light-skinned (*trigueño*)

and wearing dirty clothes, specifically, shorts, long socks, and a white shirt underneath a gray

hoodie sweater. *Id.*, at 31:14-24; 37:13 to 38:8.[10] Mr. Fernández described the man as looking

homeless. *Id.*, at 38:3-8, 65:21 to 66:1.[11] The person went to the carport and across the front of the

house before moving down to the backyard though the side. *Id.*, at 32:2-6. The government

presented two images from a video taken from the house whose camera's overlook Trevi Street

that depict Mr. Fernández arriving at Ms. Sánchez-Rivera's house at 3:39pm. *Id.*, at 39:2 to 40:3;

Gov't Exhibits 196-A, 197-A. He testified that he waited in the car for about 15 minutes until Ms.

Sánchez-Rivera arrived back at her house, which was at or about 3:56pm. *Id.*, at 30:9-10; 32:7-20;

Gov't Exhibit 198. Accordingly, Mr. Fernández's sighting of the man in Ms. Combas' property

took place sometime between 3:39pm and 3:56pm.

Mr. Fernández only saw one individual within Ms. Combas' property. His description

closely resembles that of the man depicted in the home surveillance videos.

---

[10] Mr. Fernández at first testified that the man he saw had been wearing tennis shoes. Tr. 06/12, **ECF No. 276** at 31:20-24. In response to follow-up questions by the government, he later clarified that the man was not barefoot but stopped short of confirming his observation about the type of footwear. *Id.*, at 34:12 to 35:12. He was then presented with a prior sworn statement to refresh his recollection and did not list the tennis shoes among his observations. *Id.*, at 35:3-18.

[11] In Officer Sáez's notes of defendant's January 10, 2020 statement to the police, described further below, he wrote down that defendant lived in homeless shelters in the area of Luquillo. *See* Gov't Exhibit 199-T.

### 3. Video and testimonial evidence of Ms. Combas' vehicle being driven out of Town Park by defendant after 4:30pm.

The government, moreover, presented evidence that shows Ms. Combas' white Hyundai leaving Town Park at 4:36 pm. Puerto Rico Police Officer Miguel Sáez-Rosario testified that, as part of the investigation into Ms. Combas' murder, the police collected video surveillance footage from a laundromat business that sits right outside of the main entrance to Town Park. Tr. 06/12, **ECF No. 276** at 162:22 to163:2, 164:3-7; Gov't Exhibit 121-F. Officer Sáez testified that he considered this footage important because the property is located along the quickest route out of Town Park. *Id.*, at 166:3-10. The videos taken from the laundromat's security cameras, presented by the government to the jury, show a white car, which Officer Sáez deduced to be Ms. Combas' vehicle, exiting Town Park at full speed with only one person visible in its interior. *Id.*, at 166:15 to 167:15; Tr. 06/13, **ECF No. 286** at 94:4-6; Gov't Exhibits 203, 204, 206.[12] The time stamps on the videos at the point when the white car appears read "16:36" or 4:36pm.

The government also presented Iris Loraine Fuentes to testify how she encountered Ms. Combas' white Hyundai Sonata a little later on the afternoon of January 7, 2020, along Route 868 in Trujillo Alto. Tr. 06/10, **ECF No. 265** at 9:17-18, 10:1-5. Ms. Fuentes recounted how she and her sister had to stop for a four-door white vehicle to back out into the street. *Id.*, at 11:12-20; Gov't Exhibit 153-A (marking the spot where she encountered the vehicle on a map). She testified how the driver threw a trash bag out the passenger-side window and described him as skinny, dark-

---

[12] Gov't Exhibit 204 is a slowed down clip of Gov't Exhibit 203 in which details of the vehicle (color, size, four-door sedan) can be appreciated.

skinned, with protruding cheeks and buck teeth, and wearing a blue glove. Tr. 06/10, **ECF No. 265** at 10:1-5, 12:2-21, 13:8-12. She saw no one else in the car. *Id.*, at 12:17-18, 20:23-25, 21:12-20. She testified that she found that behavior strange and that her sister took a picture of the rear end of the vehicle. *Id.*, at 12:22-24, 13:4-5, 14:8-25; Gov't Exhibits 154, 155.[13] This picture is time-stamped as being taken at 5:01pm. Tr. 06/10, **ECF No. 265** at 14:19-21; Gov't Exhibit 154. Ms. Fuentes also testified that she returned in her car to the location where she saw the driver throwing the trash bag shortly thereafter and took a picture. Tr. 06/10, **ECF No. 265** at 15:8 to 16:9; Gov't Exhibits 156, 157.[14] Ms. Fuentes was later interviewed by the police and shown a photo array of possible suspects and was asked to identify the man she had seen that day. Tr. 06/10, **ECF No. 265** at 17:19 to 20:8.[15] Once shown the photo array, without hesitation, she circled defendant's picture because "that was the person that I saw in the vehicle." *Id.*, at 20:8. This placed defendant in possession of Ms. Combas' stolen vehicle on the day she was murdered.[16]

---

[13] As to the strange behavior she witnessed, Ms. Fuentes stated that she was able to see inside the vehicle, saw defendant as the sole occupant, and that she was in shock that he was throwing trash out of the window. While alluding to his strange behavior, Ms. Fuentes indicated that "he opened and closed the door very quickly, and he took his hands out the window and he had some – he made some gestures. He had some blue gloves on, and he made a gesture sort of like with his hands like a scissor." Tr. 06/10, **ECF No. 265** at 13:8-12.

[14] The transcript mis-identifies one of the relevant exhibits as "146" where it should read "156."

[15] Ms. Fuentes worked at a restaurant in the area and, on January 9, 2020, served a group of police officers from the stolen vehicles division that were going to pick up Ms. Combas' purse, which, upon being found on the side of Route 868 by Mr. George E. López-Español, had been turned in to the police. Tr. 06/10, **ECF No. 265** at 16:10 to 17:14, 64:14-25. After one of the officers told her what they were doing there, she recounted her January 7th encounter with the white vehicle in Route 868 and showed them the pictures she and her sister took. *Id.*, at 17:3-11. She was then summoned for an interview the next day. *Id.*, at 17:13-18.

[16] In addition, Ms. Fuentes also linked defendant to the scene through the description of the driver wearing a blue glove, the same color glove that Ms. Combas was found wearing. *See* Tr. 06/07, **ECF No. 261** at 115:13-16 (testimony of Forensic Science Institute Investigator Angie Hernaiz-Rivera identifying blue glove on Ms. Combas' left hand);

Through the testimony of George E. López-Español, the government established that the contents of the trash bag Ms. Fuentes saw defendant throwing included Ms. Combas' purse. Mr. López testified on how he saw the purse in the trash bag as he was driving from his apartment complex to Plaza Escorial to have dinner. The lot where Ms. Fuentes had seen defendant throw away the purse was right in front of his apartment complex in an abandoned nutrition shop whose parking spaces were routinely used by his neighbors. Tr. 06/10, **ECF No. 265** at 60:8-20 (identifying location in Gov't Exhibit 157-B), 61:17-19, 67:16-19; *see also id.*, at 15:8-24 (testimony of Ms. Fuentes identifying Gov't Exhibit 157 as photograph she took of the trash bag and the location it was thrown). He thought that the purse could belong to someone he knew, but when he opened it, he found Ms. Combas' driver's license. Tr. 06/10, **ECF No. 265** at 61:19 to 62:16. He ended up turning the purse at the local police station while on his way to dinner. *Id.*, at 64:14-25. That ties defendant to the possession of Ms. Combas' purse the day of the murder.

> 4.  **Testimonial evidence of defendant's own admissions regarding his presence at Ms. Combas' home and his possession of her vehicle on January 7, 2020.**

Defendant's own statement, given to police three days after the carjacking-murder occurred, places him in Town Park at Ms. Combas' house on January 7, 2020. The government, through Officer Sáez, presented evidence that defendant admitted to him upon arrest on January 10, 2020, that he was at Town Park on January 7th and that he drove Ms. Combas' vehicle out of Town Park. *See* Tr. 06/12, **ECF No. 276** at 171:4 to 182:15; Gov't Exhibits 199-T, 200-A, 200-B.

---

*see also id.*, at 38:4-5, 47:3-9 (testimony of Ms. Combas' daughter, Mrs. Marrero-Combas, to the effect that her mother kept a box of blue surgical gloves at home).

During this interview, Officer Sáez testified that he wrote down his questions and defendant's responses in his notes. Tr. 06/12, **ECF No. 276** at 174:1-19, 178:18 to 179:3. As he was talking about the events that transpired on January 7th, defendant made two drawings or sketches for Officer Sáez to understand what he was explaining. *Id.*, at 175:6-7; Tr. 06/16, **ECF No. 293** at 77:12-17. One of these drawings illustrates the layout of Ms. Combas' house. Tr. 06/12, **ECF No. 276** at 177:1-178:5; Gov't Exhibit 200-A.

To be clear, defendant's statement implicated another person, Erick de Jesús, as Ms. Combas' murderer and the person who stole her car. Tr. 06/12, **ECF No. 276** at 172:15 to 173:15; Tr. 06/16, **ECF No. 293** at 53:22 to 54:9. Defendant told Officer Sáez that he stayed outside of Ms. Combas' house while Mr. De Jesús entered. *Id.* He also stated that it was only after Mr. De Jesús came out of the house and moved the car to the street that he got into the driver's seat. *Id.* He further described how it was Mr. De Jesús, sitting in the backseat of the car, who went through Ms. Combas' purse and who threw it out of the passenger-side window. Tr. 06/12, **ECF No. 276** at 173:18-23. However, Officer Sáez, describing defendant's statement as containing "half-truths," testified as to why this version events was not credible. *Id.*, at 182:16 to 183:7, 184:16 to 186:16, 187:24 to 189:21, 196:11 to 197:17, 204:10 to 209:6.

As pertains to the matter of identification of defendant as the perpetrator, defendant told Officer Sáez that he never went into the house, but his knowledge of the layout of the backyard (where Ms. Combas' body was found and where she was likely killed), and of the interior of the house (specifically, the stairway leading from the backyard to the kitchen, where Ms. Combas'

purse and car keys were), indicated otherwise. Officer Sáez testified how defendant walked him through the layout of the backyard and the interior of the house, pointing sequentially at the areas in the drawing as he was telling the jury. *Id.*, at 173:5-11, 175:4-7, 176:25 to 178:7. Officer Sáez also testified that he corroborated that Mr. De Jesús was not with defendant on January 7th until 9:00pm, after the carjacking-murder had taken place. *Id.*, at 174:1-19; 189:14-18, 196:11 to 197:6, 204:10 to 206:14. This fact is also backed up by the testimony of FBI Special Agent William López, who testified that Mr. De Jesús cellphone connected to a cellphone tower in Luquillo at approximately 3:21pm. Tr. 06/17, **ECF No. 295** at 23:18 to 24:22; Gov't Exhibit 212. Special Agent López testified that he found no indication that the cellphone left the coverage area of Luquillo on January 7, 2020. Tr. 06/17, **ECF No. 295** at 23:15-19.

In addition, and of relevance to defendant's involvement in Ms. Combas' murder and the theft of her vehicle, Mr. De Jesús took the stand and testified, among other things, that defendant told him on January 9, 2020, while driving in Ms. Combas' vehicle, that he had killed somebody for the car. Tr. 06/16, **ECF No. 293** at 100:17-21, 103:7-14, 177:18-21, 181:2-6.[17]

---

[17] There is some contradiction in the record as to what exactly Mr. De Jesús heard defendant say. On direct examination, he said that defendant had told him that "he had killed somebody in that car." Tr. 06/16, **ECF No. 293** at 100:17-21, 103:7-14. On cross-examination, however, after being refreshed in his recollection with his prior sworn statement, Mr. De Jesús confirmed that defendant told him that "he had killed someone to get the Hyundai." *Id.*, at 177:18-21, 181:2-6. The sworn statement provided by Mr. De Jesús after his arrest, as admitted into evidence, reflects that defendant told him "I killed somebody for this car." *See id.*, at 219:3-4; Gov't Exhibit 227-T at 6.

5.  **Testimonial evidence of defendant's continued possession of Ms. Combas'
    vehicle from January 7 to January 9, 2020.**

When Ms. Santiago took the stand, she testified that defendant had arrived at her house
in Gurabo in a white vehicle on January 7, 2020, at around 7:00pm. Tr. 06/12, **ECF No. 276** at 97:1-
7. He arrived alone. *Id.*, at 98:19-23. She told the jury that defendant had gone to talk to their
father, "that he wanted to get his family back." *Id.*, at 97:12-13. She then recounted how she got
in the car and how they drove to Luquillo. *Id.*, at 98:17 to 99:3. They later picked up Mr. De Jesús
and drove to a small beach, where she got out of the car and left defendant and Mr. De Jesús
alone. *Id.*, at 100:12-23. Sometime after, defendant drove her back to her home. *Id.*, at 101:6-12.

For his part, Mr. De Jesús took the stand and testified how he first met up with defendant
on January 7th at around 9:00pm or 10:00pm in an abandoned house in Luquillo, which he
referred to as "Sandra's house." Tr. 06/16, **ECF No. 293** at 92:20 to 93:13. Mr. De Jesús noticed a
white car parked outside. *Id.*, at 93:14-23. He testified that after buying some drugs for defendant,
defendant asked him for a change of clothes, and they drove to Mr. De Jesús' house in the white
car before returning to Sandra's house. *Id.*, at 93:25 to 96:5. During that ride, Mr. De Jesús
recounted that he saw a blue medical glove with some blood, that he mentioned it to defendant,
that defendant put it in a purse and threw it out the car window. *Id.*, at 94:23 to 95:13, 150:14-15.
When they returned to the Sandra's house, they picked up Ms. Santiago, who had been there
when Mr. De Jesús first arrived. *Id.*, at 93:10-11, 96:5-19. Defendant dropped her off at her home

in Gurabo and then drove Mr. De Jesús back to the abandoned house to drop him off. *Id.*, at 96:8-21.

Mr. De Jesús testified that the next day, January 8, defendant picked him up at around 1:00pm and that they went to try to sell some items that defendant had in the car: television sets, a grass trimmer, tools, and several liters of alcohol. Tr. 06/16, **ECF No. 293** at 96:24 to 97:7. Defendant drove the car for the rest of the day, picking up and dropping off other individuals, while they went from place to place trying to sell the items in the car. *Id.*, at 97:2 to 98:20. At one point, defendant and Mr. De Jesús took off alone to Fajardo, with defendant still driving the car. *Id.*, at 98:21 to 99:9. They burglarized a house and put the items they stole in the car. *Id.*, at 99:2-22. They then left and went to Río Piedras and the nearby public housing project called Monte Hatillo sometime around 5:00am, already being the morning of January 9. *Id.*, at 99:23 to 100:12. In Monte Hatillo, they sold the stolen goods. *Id.*, at 100:6-12. After that, Mr. De Jesús stated that they went to Gurabo to pick up Ms. Santiago. *Id.*, at 100:12 -15. According to Mr. De Jesús' testimony, as mentioned above, on the way to Gurabo defendant tells him that "he had killed somebody for the car." *Id.*, at 100:17-21, 103:7-14, 177:18-21, 181:2-6; Gov't Exhibit 227-T.

Ms. Santiago testified that defendant arrived at her house at around 4:00pm to 4:30pm driving the same white car and with Mr. De Jesús. Tr. 06/12, **ECF No. 276** at 101:20 to 103:7. Mr. De Jesús testified that after they picked up Ms. Santiago, defendant drove to Monte Hatillo and dropped him off, only to pick him up again sometime later. Tr. 06/16, **ECF No. 293** at 100:23 to 101:12. Ms. Santiago testified that they were driving for several hours through places she was

not familiar with. Tr. 06/12, **ECF No. 276** at 103:15-20. According to Mr. De Jesús, all three then headed to the Manuel A. Pérez public housing project and smoke "potpourri" or synthetic marijuana. *Id.,* at 101:12 to 102:5. At all times, it was defendant who dove and controlled the vehicle.

It is at this point that a police patrol car encounters them in the white Hyundai Sonata, as recounted by the testimony of Puerto Rico Police Officer Luis E. Osorio-Ortega, who was in the patrol car. Tr. 06/10, **ECF No. 265** at 131:4-16. Officer Osorio testified that the car was blocking a two-lane street. *Id.,* at 131:6-11. He recounted how he had his vehicle's headlights on and facing the car and could see three occupants. *Id.,* at 131:12-16. He then testified that, when he turned on the police siren, he saw the driver stick his body out of the driver-side window—up to his shoulders—to look back at the patrol car. *Id.,* at 131:17-24. He then described the driver as skinny, with light dark skin, a long nose, and a thin face, and stated that he could see his front teeth, and proceeded to identify defendant in open court as the driver. *Id.,* at 131:25 to 132:20.[18] Officer Osorio then testified that he recognized the vehicle as one that had been reported stolen the day before because the back bumper was missing and the stolen vehicle had been described as having a "broken" bumper. *Id.,* at 133:7-12. He then reported the license plate through the radio and got confirmation that it was a stolen vehicle. *Id.,* at 133:14 to 134:3.

---

[18] Officer Osorio's description of the driver's physical attributes and behavior bear a significant resemblance to that given by Ms. Fuentes in her testimony regarding her encounter with defendant on January 7th.

Officer Osorio testified that he continued to follow the vehicle until backup arrived. *Id.*, at 134:5-22. When it arrived, he turned on his official vehicle's lights. *Id.*, at 136:7-11. He then testified as to how the vehicle sped up and crashed into the car in front of it, ran the red light, and lost control in front of a Subway, crashing into a blue fence. *Id.*, at 136:12 to 137:3. The driver got out and ran behind the Subway. *Id.*, at 137:5-7; Tr. 06/12, **ECF No. 276** at 104:5-8 (testimony of Ms. Santiago). The backup officers chased the driver, while Officer Osorio and his partner chased a passenger that had gotten out, Mr. De Jesús. Tr. 06/10, **ECF No. 265** at 7:8 to 138:13 (testimony of Officer Osorio); Tr. 06/16, **ECF No. 293** at 102:6-17 (testimony of Mr. De Jesús). Ms. Santiago was taken out of the car and arrested. Tr. 06/12, **ECF No. 276** at 104:6-14 (testimony of Ms. Santiago).

The above testimony clearly supports the conclusion that defendant was in possession and control of Ms. Combas' vehicle on January 7, 8, and 9, 2020. This evidence establishes that defendant was the only person known to have driven the car after Ms. Combas' death.

***

The lengthy recounting of the evidence above offers one inescapable conclusion: there is sufficient unrebutted evidence tying defendant to the scene of the crime and to the murder of Ms. Combas and the theft of her vehicle. The jury heard plenty of evidence to support a reasonable inference that defendant was the man who was seen walking in Town Park in the morning of January 7, 2020, and later seen walking to Ms. Combas' backyard, where her murder likely took place. There is also sufficient evidence for a reasonable juror to conclude that it was

defendant who took Ms. Combas' vehicle immediately after her death, drove out of Town Park,

disposed of her purse and driver's license, and maintained exclusive possession of the vehicle

for two straight days until crashing and abandoning it on January 9, 2025. Accordingly,

defendant's sufficiency challenge as to lack of sufficient identification evidence has no merit.[19]

> **B. Whether the evidence is sufficient to find that defendant had the specific intent to cause death or serious bodily harm when Ms. Combas' car was taken.**

> **1. Intent to cause death or serious bodily harm.**

The carjacking-murder statute contains a specific intent element. Thus, a person violates

the statute when "at the moment the defendant demanded or took control over the driver's

automobile the defendant possessed the intent to seriously harm or kill the driver if necessary

to steal the car (or, alternatively, if unnecessary to steal the car)." *Holloway v. United States*, 526

U.S. 1, 12 (1999). In other words, a defendant must be willing to cause death or serious bodily

harm in carrying out the carjacking. Defendant thus argues that the government did not present

sufficient evidence of defendant's intent to cause death or serious physical harm. **ECF No. 315-1**

---

[19] The lack of DNA evidence linking him to the scene is irrelevant in light of the rest of the evidence. *See United States v. Forty-Febres*, 982 F.3d 802, 807 (1st Cir. 2020) (denying sufficiency argument against carjacking-murder conviction premised on lack of DNA evidence). In any case, it is not correct to say that there was a total absence of DNA evidence linking defendant to the scene. There is one piece of DNA evidence that could support defendant's presence in Town Park. When Ms. Combas' vehicle was found by the police, a pair of black-gray sandals with red highlights and Jordan logo were found inside. These were tested for DNA and one was positively matched to defendant. *See* Tr. 06/17, **ECF No. 295** at 89:9 to 90:3 (testimony of DNA forensic analyst Roberto López-Arroyo). The person seen walking around Town Park on January 7, 2020, had similar dark-colored sandals, as depicted in the home surveillance videos. Although the jury could have relied on Ms. Santiago's identification of defendant in Mr. Arocho's videos, or on defendant's own admission to Officer Sáez that he was outside of Ms. Combas' property, the sandals offer an additional link.

at 12 (pointing to lack of evidence of preparation, a prior demand for vehicle, or that confrontation was inevitable or purposefully elicited).

As stated above, there is little direct evidence of the moment of Ms. Combas' killing, but there is an abundance of indirect evidence upon which the jury could rely to render a guilty verdict. *See United States v. O'Brien*, 14 F.3d at 706-07. Notwithstanding the lack of a proverbial smoking gun, the evidence marshaled by the government at trial is sufficiently eloquent on the question of whether the perpetrator of Ms. Combas' murder possessed the intent to cause her serious bodily harm or death.

The principal evidence on this issue came from Dr. Javier G. Serrano-Serrano, the forensic pathologist who performed the autopsy on Ms. Combas' body. Dr. Serrano testified that Ms. Combas showed signs of both contusions and abrasive lacerations to the left side of her head and that her upper left ear was almost completely amputated. Tr. 06/10, **ECF No. 265** at 89:9-24. Dr. Serrano further testified that he found multiple signs of hemorrhaging throughout the cranial pole, the muscle, and the soft tissue, which indicated blunt-force trauma. *Id.*, at 103:9-18. After removing most of the soft tissue and muscle covering the left side the cranium, Dr. Serrano also observed several "branching" fractures as well as inward bone displacement, which he took as pointing to the possibility of multiple impacts to the same area with the same object and implying "a large force." *Id.*, at 103:25 to 105:3. He stated that this trauma was consistent with the linear laceration found in Ms. Combas' left ear. *Id.*, at 105:4-6.

As to the right side of the cranium, Dr. Serrano testified that he observed extensive areas of hemorrhaging in muscle and soft tissue "as a result of the impact received in the right side of the head," as well as linear fractures in the bone. *Id.*, at 105: 12-23. He stated that these injuries were probably produced as a result of the impacts received on the left side of the head, either through displacement and further impact of the right side with a flat surface (*i.e.*, falling and impacting a wall or floor), or as direct extensions of the fractures seen at the base of the cranium. *Id.*, at 105:24 to 106:14. As to the brain itself, the right side showed hemorrhaging which showed trauma from the brain being displaced by the left-side impact towards the right-side cranium wall. *Id.*, at 107:15 to 108:19. Dr. Serrano further described an extensive "hinge fracture" running through the base of the skull. *Id.*, at 109:5-22, 110:7-9. Dr. Serrano explained that a hinge fracture occurs when "extreme force is applied[,] a huge blow with an extreme force [that] doesn't occur in any simple fall from our feet." *Id.*, at 109:24 to 110:1. He compared it to cases of "car accidents with pedestrians or extreme blows or impacts with other objects." *Id.*, at 110:1-3. Dr. Serrano also testified that, due to the absence of aspiration of blood in the lungs, he understood that she had died in a very short period of time. *Id.*, at 110:10-16.

Dr. Serrano further testified that Ms. Combas appeared to have been also struck in the back of the head and in her right upper back due to the presence of lacerations, contusions, and soft tissue hemorrhaging. *Id.*, at 93:20 to 96:11. He also described the object that caused said injuries as having a "very defined" or "very linear" border on its external surface. *Id.*, at 90:2-11, 94:15-25. Dr. Serrano testified that he found that Ms. Combas' right forearm was fractured in

two places and showed signs of blunt force trauma. *Id.*, at 98:10 to 99:1, 102:15 to103:3. He also stated that Ms. Combas had lacerations on her lower right leg. *Id.*, at 96:18-24.

Furthermore, the government established through Dr. Serrano that the murder weapon was the bloodied cement block found feet from Ms. Combas' body. Dr. Serrano evaluated the cement block and concluded that it was consistent with the wounds he had described to the jury. *Id.*, at 110:20 to 111:5.[20] His conclusion was that Ms. Combas died by homicide due to blunt-force injuries received all over her body. *Id.*, at 111:6-11.

The evidence summarized above could comfortably lead a reasonable juror to find that Ms. Combas' murderer hit her with such extreme force that the intent was not only that of causing serious bodily harm, but rather to kill her. The fact that she was hit several times with a cement block in different parts of her head and back, coupled with the overwhelming force of the blows, renders any contrary conclusion unsustainable.

As to the peripheral details of Ms. Combas' encounter with her killer, they do not affect the finding of intent. The statute does not require that there be a prior demand for the vehicle before force or the threat of force is employed against the victim. *See United States v. Huertas*, 148 F.4th 1, 32 (1st Cir. 2025), *cert. denied sub nom. Pizarro-Mercado v. United States*, No. 25-5981, 2025 WL 3507070 (U.S. Dec. 8, 2025) (citing *United States v. Guerrero-Narváez*, 29 F.4th 1, 9 (1st Cir. 2022)). The lack of evidence as to what, if anything, was said by the murderer to Ms. Combas is

---

[20] DNA analysis performed by Laboratory Director and Forensic Scientist Carmen A. Tirado-Neris of the Puerto Rico Forensic Science Institute indicated that the genetic material found on the cement block belonged to Ms. Combas. Tr. 06/11, **ECF No. 272** at 49:10-14.

irrelevant where the physical evidence shows that the killer struck her, and 82-year-old woman,
multiple times in the head with a cement block and with enough force to shatter her skull and
to cause substantial trauma to the other side of her skull and brain.

### 2. Relationship (nexus) between defendant's intent to cause death or serious bodily harm and the taking of Ms. Combas' vehicle.

The statute also requires a connection between the specific intent to cause death or serious
bodily harm and the taking of the vehicle. *Holloway*, 526 U.S. at 12. Defendant's contention is that
the evidence does not establish that the perpetrator's intent to cause the death of or serious
bodily harm to Ms. Combas was related to the taking of her vehicle, and claims that the
government's evidence is speculative as to the matter of intent. **ECF No. 315-1** at 15-16.
Defendant also surmises that the perpetrator could have intended to just rob valuables inside
Ms. Combas' house, but that he panicked after killing Ms. Combas and then took her car. *Id.*, at
16.[21]

In *Holloway*, the Supreme Court explained what the focus of analysis regarding the intent
requirement should be:

> The statute's *mens rea* component . . . modifies the act of "taking" the motor vehicle.
> It directs the factfinder's attention to the defendant's state of mind at the precise
> moment he demanded or took control over the car "by force and violence or by

---

[21] This "panic" theory is entirely speculative since there is no evidence on record to support this contention. On the
other hand, it is evident that the murderer took enough time to conceal Ms. Combas' body under a mound of cut
grass taken from ripped trash bags. The murdered further thought of concealing the murder weapon in a corner of
the yard, between a low cement wall and some vegetation. Finally, as discussed below, the fact that nothing else of
value was taken besides the purse and the car suggest a preconceived objective rather than a spur of the moment
decisions.

intimidation." If the defendant has the proscribed state of mind at that moment, the statute's scienter element is satisfied.

*Holloway*, 526 U.S. at 8 (cleaned up). The moment of the "taking," however, has not been interpreted so narrowly as to be only the moment when the perpetrator physically takes the car and drives off; rather, it applies to the moment when he gains control of it. Accordingly, a carjacker may intend to cause death or serious bodily harm before taking the vehicle and still meet the statute's specific intent requirement. *See United States v. García-Álvarez*, 541 F.3d 8, 16 (1st Cir. 2008) ("In García's case, the 'taking' of the motor vehicle occurred in the apartment building's basement, when López was forced to turn over his car keys. It was at that point that the assailants gained constructive control over López's car."); *United States v. LeCroy*, 441 F.3d 914, 925 (11th Cir. 2006) ("[A]t the moment the defendants got into the vehicles and left the crime scenes, the force used to take the car was, to some extent, in the past. . . . [H]owever, the jury could find that the force was being exerted pursuant to an intent to steal the vehicle and in furtherance of the carjacking. We so hold in this case."); *see also United States v. Rivera-Rivera*, 146 F.4th 59, 73–74 (1st Cir. 2025), *cert. denied sub nom. Hernández-Carrasquillo v. United States*, No. 25-5922, 2025 WL 3260266 (U.S. Nov. 24, 2025) ("We have previously found the requisite intent for carjacking where a defendant used violence <u>before</u> the car was taken and likely knew that his codefendant was armed."). What matters is the connection between the intent to cause death or serious bodily harm and the taking—that the perpetrator caused or was prepared to cause death or serious bodily harm in order to take the vehicle.

The two out-of-circuit cases on which defendant relies in this matter are distinguishable. In *United States v. Applewhite*, 195 F.3d 679 (3rd Cir. 1999), the Third Circuit reversed a carjacking-murder conviction in a domestic violence dispute because the defendant's intent was "clearly" to kill or cause serious bodily harm to the defendant's lover's estranged husband, not to steal his car. *Applewhite*, 195 F.3d at 685. The Third Circuit also reasoned that the use of force was done in furtherance of accomplishing the criminal objective of assaulting the victim, not taking the car. *Id.*, at 686. It was only after the original intent was fulfilled that the defendant took the victim's car to transport the limp body (and only later did he kill the victim when he unexpectedly awoke). *Id.*, at 683, 686. Thus, the Third Circuit reasoned: "Even when this record is viewed in the light most favorable to the government, it is clear that the prosecution failed to establish the required nexus between the assault and the taking. Rather, the record establishes that the van was taken as an afterthought in an attempt to get Romero's limp body away from the crime scene." *Id.*, at 686. And in *United States v. Harris*, 420 F.3d 467 (5th Cir. 2005), the Fifth Circuit also reversed a carjacking-murder, but premised on the lack of evidence as to the defendant's intent. The jury there received no evidence of how or why the defendant came to be in the same vehicle as the victim, and therefore the evidence did not establish beyond reasonable doubt that there was any intent to kill or cause serious bodily harm to take the vehicle from the victim. As the court put it:

> The record does not resolve in any respect whether Harris initially gained access to the car by Ceniceros's consent or encouragement. The applicable standard permits sufficiency of evidence even in the absence of direct evidence; but on this

record, nothing supports a reasonable inference as to Harris's intent at the precise moment he demanded or took control of the car.

*Harris,* 420 F.3d at 474.

Although illustrative of the varying factual scenarios in which the carjacking-murder statute's specific intent element can play out, neither case provides a rule of decision here, nor do they square with the evidence the government presented as to defendant's intent and motive tying Ms. Combas' murder to the taking of her vehicle. To lay out the connection between the taking of Ms. Combas' vehicle and the intent to cause her death or serious bodily harm, the government harkens back to the fact that Ms. Combas' car, parked at her carport, was the "first thing of value" in the property that would be visible to anyone standing on the street—and the first thing defendant would have seen when he entered the property. **ECF No. 329** at 23. Indeed, Ms. Combas' neighbor, Ms. Sánchez, testified that when she left the house at or around 3:30pm, she saw the car in the carport. Tr. 06/06, **ECF No. 256** at 80:3-16. Moreover, Forensic Investigator Hernaiz testified that the inside of the carport would be visible from the street. Tr. 06/07, **ECF No. 261** at 94:15 to 95:3; Gov't Exhibits 6, 7. She also testified that from the back of the carport, one would be able to see down to the backyard, specifically, to the location where Ms. Combas' body was found. *Id.,* at 95:19 to 96:15; Gov't Exhibits 9, 10, 11, 12. The same was attested to by Ms. Combas' daughter, Mrs. Marrero-Combas. Tr. 06/06, **ECF No. 256** at 184:5-20; Gov't Exhibit 99. The handyman, Mr. Fernández, testified not only that the car was in the carport at around 3:40 pm, but that the man he saw walked from the car, crossed the front of the house, and went

into the backyard through the side of the house. Tr. 06/12, **ECF No. 276** at 30:11 to 32:6.[22] Having heard and seen this evidence, a reasonable jury could have inferred that defendant entered the carport to inspect the car, saw Ms. Combas weeding in the backyard from above, and then walked across the front of the house to descend to the backyard to confront her and obtain the keys, ultimately resulting in him killing her and taking her vehicle.[23]

Evidence also supports a finding that, after killing Ms. Combas, the perpetrator entered her house through a door in the backyard that leads into the kitchen, where he took only her purse containing the car keys. Keys in hand, the perpetrator followed a clear path to the vehicle through the interior of the house. According to Ms. Sánchez, when she entered the house to look for Ms. Combas in late afternoon of January 9th (when Ms. Combas' was still missing), she found the gate to the carport, the kitchen door, the basement-terrace door, and the gate to the backyard all open. Tr. 06/06, ECF **No. 256** at 87:3 to 92:15 (testimony of Ms. Sánchez). According to Ms. Combas' daughter, no other items were stolen. *Id.*, at 158:10-17, 167:4-14, 181:1 to 183:8, 185:7-10 (testimony of Mrs. Marrero-Combas). This strongly suggests that the motive of the perpetrator

---

[22] That coincides with the path defendant told Officer Sáez that Mr. De Jesús took to enter the house, but the jury heard Officer Sáez corroborate that Mr. De Jesús was not in Town Park at the time this occurred. Tr. 06/12, **ECF No. 276** at 173:5-11, 174:1-19, 175:4-7, 176:25 to 178:7; 189:14-18, 196:11 to 197:6, 204:10 to 206:14.

[23] In addition to the above, Mrs. Marrero-Combas testified that her mother normally closed the carport gates with a chain and "Master" branded padlock that when opened, separated in two parts: a hook and the lock. Tr. 06/06, **ECF No. 256** at 155:2 to 156:12. The padlock from this gate was found separated in two parts on the side of the house in the path leading to the backyard, along with some black plastic sunglasses. Tr. 06/07, **ECF No. 261** at 54:23 to 55:6 (testimony of Officer Marrero), 90:18 to 91:2, 107:24 to 108:6 (testimony of Forensic Investigator Hernaiz). The jury could have reasonably inferred that defendant removed the padlock from the carport gates prior to walking to the backyard, supporting a conclusion that defendant had decided to take the vehicle before moving to confront Ms. Combas in the backyard and that all he needed were the car keys. On his way back to the carport, defendant would have only needed to push the gates open and drive away.

was to steal the car and nothing else. Indeed, as it relates to defendant, the testimony of Mr. De

Jesús shows that defendant obtained and stole several miscellaneous items between January 8th

and 9th to sell for money. Tr. 06/16, **ECF No. 293** at 96:24 to 100:12.[24] If his general intent was to

rob Ms. Combas' house and not her car specifically, it stands to reason that he would have taken

something else of value—like Ms. Combas' jewelry, television, or gardening tools—but he did

not. And regardless, even if there were some other motive, "it is enough that the defendant be

aware that the action in which he is engaged . . . involves the taking of a motor vehicle." *García-*

*Álvarez*, 541 F.3d at 16 (citing *United States v. Rivera-Figueroa*, 149 F.3d 1, 4 (1st Cir. 1998).

Moreover, the government points to evidence that defendant's motive was to obtain a car

to visit his family in Gurabo—*i.e.*, Ms. Santiago and her father—and to get some clothes he left

in Luquillo. Tr. 06/12, **ECF No. 276** at 97:4-13, 99:2-9 (testimony of Ms. Santiago).[25] The

government also suggests that the jury could infer from Mr. De Jesús' testimony of the events of

January 8th and 9th that defendant wanted a car to more easily transport stolen goods to pawn

---

[24] Defendant's theory of an alternative motive and intent relies exclusively on an alternative reading of Mr. De Jesús' testimony: that because defendant went on a selling spree of stolen items the next day, it suggests that he entered Ms. Combas' home just for the purpose of stealing valuables and only incidentally stole the car after killing her. *See* **ECF No. 315-1** at 16 (citing to portions of Mr. De Jesús testimony, at Tr. 06/16, **ECF No. 293**, and to notes of a sworn statement, Gov't Exhibit 227-T (mis-identified the relevant exhibit as "127-T," which does not exist)). However, it is not the Court's task on a sufficiency challenge to determine whether the government successfully rebutted every possible scenario that may support defendant's innocence. *See United States v. Maymí-Maysonet*, 812 F.3d 233, 236 (1st Cir. 2016); *United States v. Victoria-Peguero*, 920 F.2d 77, 86-87 (1st Cir. 1990); *see also United States v. Guzmán-Montañez*, 756 F.3d 1, 9 (1st Cir. 2014) ("Conflicting theories are for the factfinder to decide, not for us to entertain."). The Court must simply review the evidence underpinning the jury verdict and determine whether the record supports a verdict of guilt beyond reasonable doubt. And the evidence clearly supports the government's proffered theory of motive and intent.

[25] This admission clearly provided for an inference on the nexus between the "intent to cause death or serious bodily harm" and the taking of the vehicle.

shops or contacts to whom he could sell them too. *See* **ECF No. 329** at 11-12. In addition, there's Mr. De Jesús testimony that defendant told him that he had killed someone to get the car. Tr. 06/16, **ECF No. 293** at 100:17-21, 103:7-14, 177:18-21, 181:2-6; Gov't Exhibit 227-T at 6. This evidence provided the jury with a reasonably supported motive for defendant entering Ms. Combas' home to specifically steal her car.

Finally, although the fact that Ms. Combas was killed does not alone satisfy the intent element of § 2119, "[c]ommon sense ... dictates that the final act, at the very least, evidences the intent." *United States v. Rodriguez-Adorno*, 695 F.3d 32, 43 (1st Cir. 2012) (quoting *United States v. Castro-Davis*, 612 F.3d 53, 63 n.13 (1st Cir. 2010)). Coupled with the above-recited evidence, the Court concludes that a reasonable jury was more than justified in finding that defendant had the specific intent to cause death or serious bodily harm when he took Ms. Combas' vehicle from her.

### C. Whether the evidence is sufficient to establish that defendant took Ms. Combas' vehicle from her person or presence.

The carjacking-murder statute requires that the vehicle be taken from the victim's person or presence. *See United States v. Savarese*, 385 F.3d 15, 20 (1st Cir. 2004) ("The statute . . . applies only in a situation where the vehicle remained in an area proximate to the victim and the victim retained some degree of control over the space in which the vehicle was parked."); *see also Castro-Davis*, 612 F.3d at 61 (citing *Savarese*). Defendant argues that Ms. Combas' car was not proximate enough to be taken from her person or presence under the statute because it was in the carport

in the front of her house, where she could not see it, whereas she was down in the backyard when she was killed. **ECF No. 315**-1 at 16-21.

In *United States v. Savarese*, the First Circuit held that the statute's person-or-presence requirement was met where a defendant, while inside a house with the victims, forced the latter to turn over the keys to a vehicle that was parked outside of the house. As to the legal issue, the court recognized that "at a minimum, proximity and the ability to influence the space encompassing the vehicle is required." *Savarese*, 385 F.3d at 19. Surveying case law from other circuits, including *United States v. Boucha*, 236 F.3d 768 (6th Cir. 2001); *United States v. Kimble*, 178 F.3d 1163 (11th Cir. 1999), and *United States v. Moore*, 198 F.3d 793 (10th Cir. 1999), the court concluded that "[t]he statute thus applies only in a situation where the vehicle remained in an area proximate to the victim and the victim retained some degree of control over the space in which the vehicle was parked." *Savarese*, 385 F.3d at 20. In applying that principle to the facts, the First Circuit found that the victims "were not inside or immediately next to their SUV when [defendant] took the keys from them. However, the vehicle remained proximate to them in the driveway just outside their home, and [they] retained an ability to control the area in which the vehicle was located." *United States v. Savarese*, 385 F.3d at 20.

The principle laid out in *Savarese* has been applied in later precedents. In *United States v. Vega-Molina*, the First Circuit applied it to a case where defendants assaulted the victim in an office and then abducted him in his own car. *United States v. Vega-Molina*, 407 F.3d 511, 517 (1st Cir. 2005). The court concluded that "[a]lthough the perpetrators assaulted [the victim] and took

his keys while inside the office, his car was parked in the company lot, sufficiently close by so that, if not overcome by his assailants, Muñoz could have retained possession of it." *Id.*, at 528. Further, in *United States v. García-Álvarez*, the First Circuit stated unambiguously that the taking of a motor vehicle "need not be in close proximity to the motor vehicle." *United States v. García-Álvarez*, 541 F.3d 8, 16 (1st Cir. 2008). There, the defendant and others forcefully held the victim in an apartment building's basement and took his car keys. *Id.* They then proceeded to burglar his apartment and take his car. *Id.*, at 11-12. The court considered that the moment of the "taking" occurred when they took his keys while he was held in the basement: "[i]t was at that point that the assailants gained control over [the victim's] car." *Id.*, at 16.[26]

The facts supported by the evidence here demonstrated that Ms. Combas' car was parked in the carport of her home at the time she was killed in the backyard. Tr. 06/06, **ECF No. 256** at 80:3-16 (testimony of Ms. Combas' neighbor, Ms. Sánchez). The house at issue is not some country estate where one would need several minutes to get from one end of the property to the other—it is a relatively compact, suburban two-story house with a lower-level basement terrace that opens to a backyard.[27] Under *Savarese*, it would be an odd thing to say that Ms. Combas was

---

[26] The First Circuit also relied on *Savarese* in *United States v. Castro-Davis* to reject a sufficiency challenge premised on the person-or-presence requirement where evidence was sufficient to conclude that the victim "was either in his car at the time of the carjacking or sufficiently nearby." *Castro-Davis*, 612 F.3d at 61-2. However, a discussion on the fact pattern of that case would not shed light on defendant's presence challenge here due to their dissimilarity.

[27] Forensic Investigator Hernaiz sketched the property and included measurements of its dimensions. Tr. 06/07, **ECF No. 261** at 117:15 to 118:5; Gov't Exhibit 123-T. Although the property itself is not measured, the house is almost a 30-by-30-foot square (approx. 29'x30') and the backyard's depth is only about twenty-three feet and a half (approx. 23'6") from the house to the low cement wall at the end of the yard.

not in proximity to her car when she was killed, it being wholly within her property. It would be equally perplexing to say that the carport was not an area within her ability to influence or control had she not been fatally struck to the back of the head with a cement block. The car was in her carport, whose gates she typically closed with a chain and padlock. The house keys were presumably inside the house along with the car keys, as Ms. Combas regularly kept them. *Id.*, at 154:18-21 (testimony of Ms. Combas' daughter, Mrs. Marrero-Combas). And these were, presumably, in her purse, which was, in turn, normally hanging from a stool in the safety of her kitchen. *Id.*, at 154:13-19. Ultimately, when she was killed in the backyard, Ms. Combas was close enough to her vehicle that she could have easily retained its possession if not for the violence employed against her. *See Savarese*, 385 F.3d at 17 (vehicle was parked outside the house); *García-Álvarez* 541 F.3d at 12, 16 (taking occurred in basement of apartment building); *see also United States v. Casteel*, 663 F.3d 1013, 1020 (8th Cir. 2011) ("Before the robbery, [the victim's] keys were in her purse, inside her home. Her car was in her driveway. [The victim] controlled both until the [defendants] broke into her home and robbed her at gunpoint. With Eitzen forcibly confined to a chair, the [defendants] stole [the victim's] keys from her purse and her car from her driveway—just twenty feet from her house where she sat."). Concluding otherwise would render the carjacking statute useless in home invasion cases where the victim is harmed or killed in one room and the car or the car keys are outside or in another room.

Notwithstanding the above, defendant's argument goes further. Relying on out-of-circuit cases, he argues that a distinction exists under the statute when the car keys, not the car, are

what is taken from the person by force, violence, or intimidation.[28] According to defendant, while the car need not be "immediately near the victim" for the statute's person-or-presence requirement to be met, in such scenarios the car keys must be taken "from the victim's presence through force, violence or intimidation." **ECF No. 315-1** at 17; *see also id.*, at n.9 (citing authorities). Defendant relies mainly on *United States v. Rogers*, 777 F.3d 934 (7th Cir. 2015) to maintain that "relinquishing the car keys is equivalent to relinquishing control of the car" and thus, the taking of the car keys substitutes the taking of the car for purposes of the person-or-presence requirement. **ECF No. 315-1** at 18. But defendant's proffered distinction is one without substance. Nothing in *Rogers* or in the other cited cases suggests that courts have ruled with this distinction in mind. In fact, as defendant himself points out, *Rogers* places no weight on there being a difference between the taking of the car and the taking of its keys. The Seventh Circuit was very clear in rejecting a distinction "between taking a victim's car outright and taking a victim's keys as merely the first action in the seizure of her car." *Rogers*, 777 F. 3d at 936. Defendant's argument reads more like a gloss on murder-carjacking cases, hypothesizing that the way courts have interpreted the person-or-presence requirement to reach vehicles not in the immediate vicinity of a victim is by extending the analysis to the taking of the vehicle's keys. But a more persuasive reading is that there is no difference between the taking of the car and the taking of the car keys for purposes of the person-or-presence requirement. Thus, if the car does

---

[28] Defendant asserts that the government did not show beyond reasonable doubt "that Ms. Combas' car keys were taken from her presence, and did not show that the car was in her sphere of control such that she could have prevented taking of the car." **ECF No. 315-1** at 18.

not need to be taken directly from the person (but rather, from a proximate area within the victim's ability to control), as *Savarese* and *García-Alvarez* hold, the car keys need not also be taken from the person directly but rather from a "proximate" place, as that term is understood in case law. Here, the same analysis applicable to Ms. Combas' car applies to the car keys. There was sufficient evidence for a jury to conclude that the keys were located in Ms. Combas' purse, which itself was located in her kitchen. The kitchen was both proximate and within her zone of control, and had she not been killed, she could have gone get them.

Accordingly, the Court finds no merit in defendant's sufficiency challenge as to the proximity of the vehicle or car keys.[29]

## IV.    Conclusion

For eleven days, a jury heard evidence and argument to the effect that defendant killed Ms. Combas on January 7, 2020, by bludgeoning her head with a cement block, and then stole her vehicle from her home, driving it around the Island for two straight days until he encountered the police. After receiving all the evidence—video, photographic, and testimonial, both in direct and cross-examination—the jury found defendant guilty. And after a careful analysis of the record, seen in light most favorable to the verdict, the Court concludes that the

---

[29] Although not directly addressed above because they went unchallenged by defendant, the other elements of 28 U.S.C. § 2119—that the vehicle be transported, shipped or received in interstate or foreign commerce and that death resulted—are amply supported by the evidence. As to the former, no vehicles are manufactured in Puerto Rico, and Ms. Combas Hyundai Sonata was manufactured in Alabama, transported to Jacksonville, Florida, and subsequently brought to Puerto Rico in a commercial vessel. *See* Tr. 06/06, **ECF No. 256** at 66 to 71 (testimony of Dennis Ramos-Rodríguez, Hyundai de Puerto Rico employee). As to the latter, it is undisputed that Ms. Combas died.

evidence supports the guilty verdict beyond reasonable doubt. Accordingly, for the reasons stated, the Court **DENIES** defendant's motion for acquittal at **ECF No. 315-1**.

**SO ORDERED.**

At San Juan, Puerto Rico, on this ___18___ day of February 2026.

S/AÍDA M. DELGADO-COLON
**United States District Judge**